## THE MARYLAND AND VIRGINIA ELDERSHIP OF THE CHURCHES OF GOD ET AL. *v.* THE CHURCH OF GOD AT SHARPSBURG, INC., ET AL.

[No. 87, September Term, 1967.]

*Decided June 6, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, FINAN and SINGLEY, JJ.

*Charles O. Fisher,* with whom were *Walsh & Fisher* and *James H. Booser* and *McNees, Wallace & Kurick* on the brief, for appellants.

*Omer T. Kaylor, Jr.,* with whom were *Kaylor & Spence* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

After we filed our opinion in this case on May 9, 1968, (see 249 Md. 650, 241 A. 2d 691) the appellants appealed to the Supreme Court of the United States. (See No. 357, October Term of the Supreme Court of the United

States, 1968.) On January 27, 1969, the Supreme Court filed its opinion in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church* (*Hull*), 393 U. S. 440, 89 S. Ct. 601, 21 L.Ed.2d 658, and by a per curiam opinion (see 393 U. S. 812, 922, 89 S. Ct. 850, 21 L.Ed.2d 750) vacated the judgment and remanded the case to us "for further consideration in light of" *Hull*. After the mandate from the Supreme Court was received by us we set the case for reargument and requested additional briefs from counsel for the parties. These briefs were duly filed and the case was reargued in due course.

We have carefully reviewed the opinion and decision in *Hull* and we have concluded that there is nothing in our original opinion which is contrary to the decision in the *Hull* case. Indeed, we believe that we anticipated the decision in *Hull* in our original opinion in the present case, and that our original opinion properly applied the constitutional principles subsequently enunciated by the Supreme Court.

The principal holding in *Hull* was to reaffirm as now applicable to the States under the Fourteenth Amendment applying the First Amendment to them, the holding in *Watson v. Jones,* 80 U. S. (13 Wall.) 679, 20 L. Ed. 666 (1872), that the doctrine of an implied trust of church property in favor of those who adhered to the faith of the founders of the particular church, with its attendant required examination into, and determination of, religious doctrine and theological determinations by the Civil Courts was inconsistent with the principles underlying the First Amendment to the Constitution of the United States forbidding the establishment of religion or the denial of its free exercise.

In our original opinion, we relied upon, in part, the decision of our predecessors in *Shaeffer v. Klee,* 100 Md. 264, 59 A. 850 (1905), which we indicated was in accord with the holding in *Watson v. Jones, supra.* In fact, Judge Page, for the Court, in the *Shaeffer* case cited *Watson v. Jones* with approval. (100 Md. at 271, 59 A. at

852.) The implied trust doctrine has not been part of the law of Maryland since the Constitution of 1776, and our original opinion made this clear.

After the Supreme Court in *Hull* rejected as contrary to the First Amendment, the application of the implied trust doctrine by a State, it then enunciated the proper basis for determination in the State courts of disputes in regard to church property as follows:

> "It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And *there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded.* But First Amendment values are plainly jeopardized *when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.* If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. * * * the Amendment therefore *commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.*" (Emphasis supplied.) (393 U. S. at 449, 89 S. Ct. at 606, 21 L.Ed.2d at 665)

The Supreme Court further emphasizes that the State courts must not determine what is proper religious doctrine but *must* dispose of church property cases upon "neutral principles of law" when it stated:

> "Hence, States, religious organizations and in-

dividuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." (393 U. S. at 449, 89 S. Ct. at 606, 21 L.Ed.2d at 665)

As we have indicated, we were required by the existing Maryland law as well as by the command of *Hull*, to decide the present case upon "neutral principles of law" developed for use in all property disputes and this we believe we have done.

First, we inquired into the provisions of the State statutory law in regard to the holding of property by religious corporations applicable to *all* religious corporations without regard to the doctrine or ecclesiastical practices of any particular religious sect or denomination. We stated:

"The two local churches were incorporated under the General Religious Corporation Law of this State, now Code (1957), Article 23, Sections 256 to 270. The present General Religious Corporation Law is based upon and largely follows the original legislation on this subject, i.e., the Act of 1802, chapter 111. The present law provides in effect that in *every* church, religious society or corporation of whatever sect or denomination 'protected in the free and full exercise of its religion by the Constitution and laws' of the State there shall be power and authority in all persons above 21 years of age belonging to 'any such church, society or congregation' to elect certain persons, not less than four nor more than twenty-five, who when elected 'shall be constituted a body politic or corporate to act as trustees in the name of the particular church, society or congregation for which they are respectively chosen, and *manage the estate, property, interest and inheritance of the same.'* (Emphasis supplied.) By the provisions

of Section 257, the trustees are given perpetual succession by their name of incorporation and very broad powers in regard to the corporate property. The trustees may purchase and hold the property and 'use or lease, mortgage or sell and convey the same in such manner as they may judge most conducive to the interest of their respective churches, societies or congregations,' with a provision that they shall not sell, mortgage or dispose of property held by the corporation under an instrument prohibiting such sale. There are provisions for election of trustees, how their succession is maintained, with a provision that the minister or senior minister shall be a member of the corporation, *ex officio*, as well as provisions for the arbitration of contested elections, provisions for the adoption of a plan, agreement or regulation at the first election of trustees, its acknowledgement and entry in a book required to be kept, the recording of the plan, agreement or regulation with the Department of Assessment and Taxation and the procedure for amendment." (249 Md. at 656, 241 A. 2d at 695-96)

We also pointed out that there are special statutory provisions in regard to the government of four religious denominations, the Protestant Episcopal Church, the Presbyterian Church in the United States of America [now known as the United Presbyterian Church in the United States of America], the Methodist Church and the Roman Catholic Church. These code provisions were adopted at the request or with the acquiescence of the denominations affected but as we observed in the original opinion "these provisions are not involved in the present case." (249 Md. at 674, 241 A. 2d at 705) We did make various references to these code provisions to illustrate various differences in church polity in regard to the holding of property by local churches and suggested that this was one possible method by which a parent body

in a hierarchical denomination might maintain control of local church property. (249 Md. at 663, 241 A. 2d at 699) We did not intend, however, to express any opinion in regard to the validity of any of these special provisions in the light of the requirements of the First Amendment, or otherwise, inasmuch as none of these provisions was involved in the present case, as we observed above.

The Maryland Religious Corporation Law is a general law for *all* religious corporations and has no reference whatever to doctrine. It, therefore, meets the requirement of a "neutral principle of law."

Secondly, we considered the express language of the deeds by which the properties in question were conveyed to local church corporations. We stated:

> "Nor do the deeds for the properties of the local churches provide for their reverting to the Md. & Va. Eldership if the congregation withdraws from that Eldership. The deed to the Sharpsburg church recites in the habendum clause that it is held by the trustees and their successors 'in trust for the use of the congregation of the Church of God at Sharpsburg, Maryland,' and—
>
> "'* * * in the event the congregation of the Church of God at Sharpsburg, Maryland, *ceases to function as a church organization,* then all right, title and interest in the hereinabove described property shall immediately vest in the Maryland and Virginia Eldership of the Churches of God in North America, a body corporate, its successors or assigns.' (Emphasis supplied.)
>
> "One of the Indian Springs deeds has a provision that if the church should *become extinct or cease to be* the property reverts to the Md. & Va. Eldership; the other Indian Springs deed (for the parsonage) contains no reverter clause whatever." (249 Md. at 665, 241 A. 2d at 700)

We observed that there is no provision in the respective deeds for a reverter to the general church upon a departure or deviation from doctrine or upon a withdrawal by the local church from the Eldership. There is *only* a reverter in the event the local church should *become extinct* or *cease to be,* and this contingency did not occur in the present case. It seems clear that a consideration of the language of the deeds and the necessary interpretation of that language was an application by us of a "neutral principle of law."

Thirdly, we considered the language of the charters of the two local church corporations involved. We stated:

"The charters of the respective local churches plainly confer the ownership, use, management and sale of the property of the local churches on the corporations and their trustees, subject to the provisions of the local by-laws. The stated purposes of the corporations are to 'form a church organization or congregation to bring to the people of the community a vital knowledge of Jesus Christ as Lord and Savior and to promulgate the Gospel of the New Testament Scriptures' (Sharpsburg) and 'to provide its members (of the corporation) with the preaching of the Word of God, the administration of the ordinances, the facilities for public worship and the exercise of Christian discipline and to adopt and prosecute from time to time new measures as are in harmony with the spirit and teaching of the Word of God as shall tend to promote the Kingdom of God in this World' (Indian Springs). 'The business and property of the Corporation shall be conducted and managed by a Board of not less than five * * * Trustees * * *' (Sharpsburg) and 'the Trustees shall, in conformity to the law, control all property belonging to said congregation' (Indian Springs). In Section Three, subsection (e)

of the Sharpsburg Charter appears the following:

'The Corporation shall have all the General Powers conferred by Chapter 334 of the Laws of the General Assembly of Maryland, Acts of 1924, or any amendments thereto, and the enumeration of specific powers in this Certificate of Incorporation are in furtherance of and not in limitation of the General Powers conferred by law.'

In Section 3 of the Charter of Indian Springs, it is provided:

*'The congregation of this Church shall be and remain an independent congregation and may own and dispose of property, both real and personal,* as said congregation in accordance with its By-Laws and ordinances shall deem proper. This congregation and church may from time to time as may be deemed fit associate itself with such church denomination as it may deem desirable *but such association shall in no wise effect this Corporation in its ownership and control of its real and personal property, which shall be and remain in the properly constituted officers of this Corporation.'* (Emphasis supplied.)

"In neither charter is the Md. & Va. Eldership or the General Eldership mentioned." (249 Md. at 658-59, 241 A. 2d at 696-97)

These charter provisions make it plain that it was never contemplated that the property of the local churches should be subject to the control of the Eldership. It can only be concluded from the examination of the language of these charters that the local church corporations own and control their local property. Here again, this consideration of the corporate charters is the application of another "neutral principal of law" with-

out any requirement upon us to engage in any theological or ecclesiastical speculation or determination.

Fourthly, we considered the provisions of the Constitution of the General Eldership and of the Md. & Va. Eldership. We stated:

"In the Constitution of the General Eldership there is no statement in regard to the ownership or control of church property. Apparently any such provision was deliberately omitted since there was attached to the Constitution of the General Eldership a statement under the heading of 'Important Information' in which two resolutions are quoted as follows:

'1. Resolved, That this General Eldership *recommends* to all the brethren in the Churches of God to have their Bethels or meeting-houses, parsonages, etc., deeded to the elders or trustees of the respective *local churches,* and their successors in office, to be held by them in trust for the *church.*

'2. Resolved, That we also *advise* them to have inserted in the deed a provisionary clause, providing that in case the Church becomes *extinct or ceases to maintain an organization* in harmony with the doctrines and polity of the Churches of God in North America, the property shall revert to the annual Eldership of which the church is a part.' (Emphasis supplied.)

It will be observed that these resolutions are not part of the Constitution of the General Eldership and, in any event, are *advisory* only. The Md. & Va. Eldership did not accept this 'advice,' but, on the contrary, in its Constitution in Article XVII—'Deeds' provides as follows:

'Local church property, whether personal or real, shall be deeded to *the trustees of local*

*churches and their successors in office,* with this proviso: That should the church *become extinct, or cease to be,* the property shall be the property of the Maryland and Virginia Eldership, a body corporate, to be disposed of at its pleasure.' (Emphasis supplied)" (249 Md. at 664-65, 241 A. 2d at 699-700)

It is apparent that the Constitution of neither Eldership contains *any prohibition against the withdrawal* from the Eldership of a local congregation nor is there any provision for loss or forfeiture of property by a local congregation if it does withdraw from the Eldership. As we also pointed out in our first opinion, a denomination *may* provide in its constitution for a prohibition against withdrawal and for a forfeiture of local church property in the event of a withdrawal, but neither Eldership in the present case made any such provision. The consideration of the provisions of the General Eldership and the Md. & Va. Eldership is the application of a "neutral principle of law," properly explored in resolving a dispute over local church property which in no way involves the Court in the determination of any theological or doctrinal matter.

As we observed in the original opinion, the record in the present case did not *ever disclose* what the nature of the doctrinal dispute was. We stated:

"We cannot tell from the record who are the alleged heretics and who are the alleged orthodox. It is well that this does not appear, as the Civil Courts are properly wary of considering these matters. As the Chancellor aptly stated in his opinion:

'Nowhere in the pleadings, the oral arguments or the Briefs does the court find any explanations as to what prompted the withdrawals. It is to be presumed that none of the parties feel it necessary to involve the court in abstruse theological doctrines to reach a

decision of the issues.' " (249 Md. at 675, 241 A. 2d at 705)

It is our opinion that there was nothing in our previous opinion and decision in *Hayman v. St. Martin's Evangelical Lutheran Church*, 227 Md. 338, 176 A. 2d 772 (1962), on which we relied, in part, in the decision in the present case, which departed from First Amendment principles as set forth in *Hull*. We stated:

"The decision in the *St. Martin's* case establishes that even though a denomination may generally have a presbyterial polity, its relationship with a local congregation in regard to the property of that congregation may be on the basis of a congregational polity, and, further, if the by-laws of the parent body are not inconsistent with the provisions of the charter and by-laws of the local congregation providing for the control by the local congregation over its property, a minority of the congregation, although recognized as the 'congregation' by the parent body, is not entitled to the property of the local congregation and to control the local corporation." (249 Md. at 671, 241 A. 2d at 703)

Here again, in the *St. Martin's* case we did not pass upon or decide any doctrinal or theological issue, but decided that case upon "neutral principles of law."

We also observed in our original opinion that the Maryland General Religious Law does not interfere with or "establish" the doctrines or disciplines of any religious body. We stated:

"The first General Religious Corporation Law was enacted by the General Assembly by Chapter 111 of the Laws of 1802. It was re-enacted in substantially the same form by Chapter 471 of the Laws of 1868. The original Act of 1802 is

not substantially different from the present provisions of the Code but in the original Act there was a provision which stated:

'Nothing therein contained shall be construed, adjudged or taken to abridge or affect the rights of conscience or private judgment, or in the least to alter or change the religious constitution or government of any church, congregation or society, so far as respects or in any way concerns doctrine, discipline or worship.' See *Tarter v. Gibbs*, 24 Md. 323 (1866).

"This provision clearly indicates that the provisions of the Act of 1802, applicable to any and all religious corporations, was not intended in any way to interfere with or 'establish' the doctrines or discipline of any religious body. What was intended was to provide for the formation of religious corporations or local congregations which would hold, control and have power to dispose of *the property* of the religious corporations. The Act of 1802 and its successor acts in no way sought to establish any ecclesiastical polity. This was left to the corporations themselves. By the nature of the law in regard to the formation of corporations generally, the religious corporation formed under it is controlled by trustees elected by the local membership. This is true of all member corporations. This does not mean that the religious corporation thus formed may not by contract—express or implied—adopt a presbyterial or episcopal polity and, if this is done, may provide for the holding of the local church property subject to the provisions of the constitution, charter or by-laws of a denomination and the action of the authoritative agencies of such a denomination. This, however, is accomplished by the will and action of the local corporation and is in no way imposed by the State

through its General Religious Corporation Law."
(249 Md. at 673-74, 241 A. 2d at 704-05)

In short, it is our opinion that our decision is in accord with and, indeed, anticipated the decision in *Hull*. We only applied "neutral principles of law" in the resolution of the property dispute in the present case and in no way did, or attempted to, decide any matter of doctrine.

The appellants contended at the reargument that because the Md. & Va. Eldership has the authority to select the clergy on "an itinerant plan" this "is an ecclesiastical matter protected by the First Amendment." They also contended that the property rights of a local church follows "as an incident from ecclesiastical determinations of the identity of clergymen entitled to use church property pursuant to the Elderships' itinerant plan." In their brief they state "without effective discipline and control over the clergy there would not long be purity of doctrines according to denominational standards in any event."

We do not understand that the decision in *Hull* requires the State equity courts to provide effective discipline and control of a denomination over its clergy or to maintain that denomination's "purity of doctrine." As we see it, this would be "establishment of religion" with a vengeance, and under neither the Maryland law nor under the prohibitions of the First Amendment are we permitted to do this. We have no right to prevent the local congregations from separating from the Eldership and from refusing to accept the ministers appointed by the Eldership. To do this would deny to the members of the local congregation *their* freedom of religion and would in effect put the judicial power of the State behind the enforcement of the doctrine and discipline of the Eldership thus, in effect, "establishing" the religion promulgated by the Eldership. This we are forbidden to do.

Nor, in our opinion, does the local property follow "as

an incident" of the power of the Eldership to appoint clergymen for a local congregation. As we observed, the denomination in its Constitution may so provide, but in the absence of such a provision there is no "contract" between the local church corporation and the parent body, which changes the provisions of the deeds and charters of the local church corporations giving the local church corporation complete legal title, possession and the right to convey or use the local property as the local church corporation deems best. When the local church corporation, pursuant to a valid vote of the trustees and members in the exercise of their religious freedom, decided to separate from the Eldership and become an autonomous religious body, the Eldership—absent a contract or constitutional provision to the contrary — could not, as we have already indicated, obtain the assistance of a State equity court to impose its notions of proper religious doctrine and discipline upon the separated church, cause a forfeiture of the local church property to the Eldership or interfere with the dominion and control of the local church corporation over its property.

As Mr. Justice Clark aptly stated, for the Supreme Court of the United States, in *School District of Abington Township v. Schempp*, 374 U. S. 203, 83 S. Ct. 1560, 1571, 10 L.Ed.2d 844, 858 (1963), which foreshadowed that Court's decision in *Hull*:

> "The wholesome 'neutrality' of which this Court's cases speak thus stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits."

As they did in the original argument before us, the appellants relied at the reargument on the decisions of

the Supreme Court of the United States in *Kedroff v. St. Nicholas Cathedral*, 344 U. S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952) and *Kreshik v. St. Nicholas Cathedral*, 363 U. S. 190, 80 S. Ct. 1037, 4 L.Ed.2d 1140 (1960). As we stated in the original opinion:

"In our opinion, these cases are clearly distinguishable from the present case. In *Kedroff* a statute of the State of New York was involved which was passed by the Legislature of New York in 1945 to transfer control of the New York churches of the Russian Orthodox religion from the central governing hierarchy of the Russian Orthodox Church (the Patriarch of Moscow and the Holy Synod) to the governing authorities of the Russian Church in America, a church organization limited to the diocese of North America and the Aleutian Islands. The Russian Orthodox Church had always had an episcopal polity. This was not involved in the statute which, however, sought to transfer control of the New York churches from one governing body to another. The majority of the Supreme Court was of the opinion that this statute violated the Fourteenth Amendment as prohibiting the free exercise of religion. Later, after remand of the case, the New York courts found that the hierarchical authorities of the Russian Church were dominated by the Soviet Government and an appointee of such authorities could not validly occupy St. Nicholas Cathedral. These findings were reversed by the Supreme Court in *Kreshik*, holding, in effect, that the New York courts could not do what the New York Legislature was held not to be able to do in *Kedroff*. Both *Kedroff* and *Kreshik* involved the right to appoint the church ministry and an attempt to transfer by state law the power of appointment from one group of church authority to another group. There is no action

of the State of Maryland, either legislative or judicial, which sought to effectuate such a transfer in the present case. The General Religious Law applies equally to all religious corporations formed under it without regard to doctrine, discipline or other ecclesiastical matters. The action taken by Sharpsburg and Indian Springs was by a majority of the respective congregations exercising their rights and powers over the church property in accordance with the General Religious Corporation Law. The severing of the religious ties with the Md. & Va. Eldership was entirely their action in which the State of Maryland played no part, and which is not involved in this case." (249 Md. at 675-76, 241 A. 2d at 706)

See also the analysis of these two cases by Mr. Justice Brennan, for the Supreme Court, in *Hull*, 393 U. S. at 447-49, 89 S. Ct. at 605-06, 21 L. Ed. at 664-65.

In our opinion, for the reasons stated, we find no conflict between our original opinion in the present case and the decision in *Hull*. On the contrary, we find the original opinion and the prior Maryland law entirely consistent with the decision in *Hull* and, therefore, adhere to our original decision in this case.

> *Decrees affirmed, the costs to*
> *be paid by the appellants.*