UNITED METHODIST CHURCH, ET AL. *v.* ST. LOUIS CROSSING INDEPENDENT METHODIST CHURCH.

[No. 970A150. Filed December 30, 1971.
Rehearing denied February 3, 1972.]

*Basil H. Lorch, Jr., Lorch & Lorch,* of New Albany, *Thomas C. Bigley, Jr., Sharpnack, Bigley & David,* of Columbus, for appellants.

*Ralph L. Jewell,* of Columbus, for appellees.

SULLIVAN, P. J.—This action for injunction was brought by plaintiffs-appellees, a local religious congregation incorporated

according to Indiana statute, against defendants-appellants, United Methodist Church and Richard E. Hamilton, the District Superintendent of the Bloomington District of the United Methodist Church. Plaintiffs sought to enjoin the defendant, Richard E. Hamilton, from conducting religious services in the name of the defendant, United Methodist Church, on the premises of the church property occupied by the plaintiffs. Preceding the action for injunctive relief, the plaintiffs communicated to the defendant a written resolution stating that the local congregation elected to separate itself from the body of the United Methodist Church due to doctrinal differences. At the same time, the pastor of the local congregation sent his resignation to Reverend Hamilton. Reverend Hamilton then sent a letter to the President of the Board of Trustees and to the pastor of the local congregation informing them that he would personally conduct religious services on the church property beginning June 30, 1968. Upon receipt of Reverend Hamilton's letter by the President of the Board of Trustees, the trustees, as representatives of the congregation, conveyed the property by warranty deed on June 27, 1968, to a third party, known as St. Louis Crossing Churches Parking Lot, Inc. The property was in turn leased back to the plaintiffs for $5 per year. The following day, June 28, 1968, the plaintiffs instituted this action for injunction.

An injunction order supported by special findings of fact was entered in favor of the plaintiffs. In their motion to correct errors, appellants alleged that several findings of fact were erroneous, and that the conclusion of the trial court was contrary to law.

The issue presented for review is whether the plaintiff church was a part of the defendant general church and, thus, whether the property titled in "The Trustees of the Methodist E. Church at St. Louis Crossing, Bartholomew County, in the State of Indiana" was by law deemed to be held in trust for the use of the general church.

## OBJECTIONS TO DEFICIENCIES OF APPELLANTS' BRIEF WAIVED BY APPELLEES' PETITION FOR EXTENSION OF TIME

The appellees first argue that the appellants failed to properly separate their allegations of error in the motion to correct errors and that the brief submitted by them is so defective under AP. 8.3 that the appeal must be dismissed. As the appellants correctly point out, however, the appellees filed two petitions for the extension of time in which to file their own brief, and such petitions waive any argument premised upon technical defects in the record or in the appellants' brief. *City of Fort Wayne* v. *Maplewood Park Utilities, Inc.* (1966 Ind. App.), 213 N. E. 2d 337; *Indiana Bk. & Tr. Co.* v. *Lincoln Nat. Bk., etc.* (1965), 137 Ind. App. 546, 206 N. E. 2d 879.

## IMPLIED TRUST THEORY[1] OF PROPERTY APPLIED TO NON-INDEPENDENT CHURCHES

In *Watson* v. *Jones* (1871), 80 U. S. (13 Wall.) 679, the Supreme Court of the United States first classified the forms of church property questions brought before the court:

"1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.

"2. The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and

---

1. Implied trusts have been defined by decision in this state to be "those which, without being expressed, are deducible from the relation of the parties and the nature of the transaction as matters of intent, or which by operation of law are deduced from the transactions of the parties as a matter of equity independent of the particular intention of the parties." *Holsapple* v. *Shrontz* (1917), 65 Ind. App. 390, 397, 117 N. E. 547.

so far as church government is concerned, owes no fealty or obligation to any higher authority.

"3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." 80 U. S. (13 Wall.) 679, 722-723.

Mr. Justice Miller, in finding church property in that case to be held by the third method, stated:

"Here is . . . [a] case . . . of property purchased for the use of a religious congregation, and so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the property. In the case of an independent congregation we have pointed out how this identity, or succession, is to be ascertained, but in cases of this character we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." 80 U. S. (13 Wall.) 679, 726-727.

The United States Supreme Court thus indicated one hundred years ago that the title to property held by a local congregation may be held by implied trust for a general church depending upon the relation found *in fact* to exist between the local and general churches.

The legal consequences of the actual relationship existing between two churches claiming the same church property can only be determined as to such property when the polity of the denomination is known. In the recent case of *Maryland & Virginia Elder. of Ch. of God v. Church of God* (1968), 249 Md. 650, 662, 241 A. 2d 691, 698[2] (hereinafter referred to as *Sharpsburg*), it was stated that:

---

2. After the Court of Appeals of Maryland affirmed the trial court, 249 Md. 650, 241 A. 2d 691, the United States Supreme Court vacated the judgment and remanded the cause, 393 U. S. 528. The Court of Appeals, restating the reasons given earlier, again affirmed the decision of the trial court, 254 Md. 162, 254 A. 2d 162, and the Supreme Court dismissed a subsequent appeal, 396 U. S. 367.

" 'In considering questions in regard to the use of church property it is usually important in absence of express language in the deed conveying the property or making the gift to consider the polity or form of church government which the particular denomination has. In the note in 75 Har. L. Rev. at pages 1143-4, the three general types of church polity are defined as follows:

'At least three kinds of internal structure or polity may be discerned; congregational, presbyterial, and episcopal. In the congregational form each local congregation is self-governing. The presbyterial polities are representative authority being expressed by laymen and ministers in an ascending succession of judicatories—presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the espiscopal form power reposes in the clerical superiors such as bishops. Roughly presbyterial and episcopal polities may be considered hierarchical as opposed to congregational polities in which the autonomy of the local congregation is the central principle.' "

## ECCLESIASTICAL QUESTIONS CANNOT BE DECIDED BY TRIAL COURT

In proper cases, the duty of ascertaining polity must necessarily fall upon the trial court. Yet such duty cannot be carried out if it would plunge the court into ecclesiastical considerations. Polity must then, when disputed, be so easily ascertainable from its normal determinants that the trial court does not violate the First Amendment.[3]

It is clear that a hierarchical polity serves as the foundation for the implied trust theory of parental property control. It is equally clear that a hierarchial church organization, as opposed to the purely congregational form of organization[4]

---

3. As was stated in Justice Brennan's concurring opinion in *Sharpsburg* (1970), 396 U. S. 367, in referring primarily to the *Watson* approach in such controversies:

"Similarly, where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make inquiry into religious law and usage that would be essential to the resolution of the controversy." 396 U. S. 367, 370-371.

4. Hierarchical churches have been defined by the United States Supreme Court to be "those organized as a body with other churches

found in *Doughty* v. *Herr* (1933), 97 Ind. App. 427, 185 N. E. 657, a case much relied on by appellees,[5] is present here. Where a hierarchical organization exists there may be at least three methods of property control exerted, according to the original *Sharpsburg* opinion, *supra*:

" 'In many of the hierarchical churches there may be provisions in their Constitutions, Canon Law, or other controlling documents or statutes which make it clear ▪ that the property is held in trust for the uses of the parent church and its discipline and appointments * * * It thus appears that there are three methods by which a hierarchical denomination may maintain control of local church property:

(1) It may require reverter clauses in the deed to the property of the local churches.

(2) It may provide in its constitution or by some authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision.

(3) It may obtain from the General Assembly an act providing for such a result.' " 249 Md. 650 at 662, 663, 241 A. 2d 691 at 698, 699.

From the post-*Watson* era to the present our nation's highest court has adhered to *Watson,* warning civil courts against resolving church property disputes or other church controversy through reliance upon interpretation of ecclesi-

having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *Kedroff* v. *St. Nicholas Cathedral* (1952), 344 U. S. 94, 110.

The distinction between hierarchical and congregational organizations has been made by at least one court: "A hierarchical church is generally one in which authority is exercised by laymen and ministers organized in an ascending succession of judicatories, while a congregational church is one in which each local church is self-governing. (Citations omitted)" *Serbian Orth. Ch. Cong. of St. Demetrius* v. *Kelemen* (1970), 21 Ohio St. 2d 154, 256 N. E. 2d 212, 214.

5. In that case a deed to certain church property was made to "Trustees of Union Chapel of Hancock County in the State of Indiana," a particular local church not referred to as a part of a larger church organization. Compare *The Ind. Annual Conf. Corp.* v. *Lemon* (1956), 235 Ind. 163, 131 N. E. 2d 780.

astical doctrine.[6] By definition an ecclesiastical matter is one which concerns the doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of membership, and the power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church. *Olear* v. *Haniak* (1939), 235 Mo. App. 249, 131 S. W. 2d 375, 380-381; *Western Conf. of Original Free Will Baptists* v. *Miles* (1963), 259 N. C. 1, 129 S. E. 2d 600, 606; *Clark* v. *Brown* (Tex. 1908), 108 S. W. 421, 433.

The United States Supreme Court has steadfastly held governmental incursions into such ecclesiastical matters to be violative of the establishment clause of the First Amendment to the Federal Constitution. *Kreshik* v. *St. Nicholas Cathedral* (1960), 363 U. S. 190 (disputes based on ecclesiastical doctrine over church property protected from judicial interference by First Amendment) ; *Kedroff* v. *St. Nicholas Cathedral* (1952), 344 U. S. 94 (freedom to select clergy protected from legislative interference by First Amendment) ; *Gonzales* v. *Archbishop* (1929), 280 U. S. 1 (proper church tribunal determination of qualifications for chaplaincy was purely ecclesiastical matter).

Of most recent import is *Presbyterian Church* v. *Hull Church* (1969), 393 U. S. 440. Mr. Justice Brennan, in speaking for a unanimous court, stated:

> "Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are *neutral principles* of law, developed for use

---

6. The three Justices who concurred in the *per curiam* opinion in *Sharpsburg* (1970), 396 U. S. 367, indicated that the forbidden doctrinal considerations included "the trial ritual and liturgy of worship or the tenets of faith."

in all property disputes, which can be applied without 'establishing' churches to which property is awarded." 393 U. S. 440, 449. (Emphasis supplied)

He then added the caveat:

"But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice ....
"[T]he Amendment therefore commands civil courts to decide church property disputes without resolving under-lying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure re-lationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." 393 U. S. 440, 449.

## NEUTRAL PRINCIPLES TO BE CONSIDERED

While the *Hull* case did not enunciate what principles of neutral law should be considered in determining property rights of churches, several state cases have mentioned these principles. The Supreme Court of Ohio in *Serbian Orth. Ch. Cong. of St. Demetrius* v. *Kelemen* (1970), 21 Ohio St. 2d 154, 256 N. E. 2d 212, 216, said: "We look to the ordinary indicia of property rights." The indicia mentioned in that case included the articles of incorporation and by-laws of the local church, the corporate laws of the state, the state law regarding implied trusts,[7] recorded deeds, and "any other secular instruments not requiring the resolu-tion of religious tenets or doctrine." 256 N. E. 2d 212, 217. In *Maryland & Virginia Eldership* v. *Church of God* (1969), 254 Md. 162, 254 A. 2d 162, the Court of Appeals of Maryland in its second consideration of that matter[8] emphasized that its inquiry involved only neutral principles of law: (1) pro-visions of the state statutory law regarding the holding of

---

7. Ohio law apparently does not, however, recognize an implied trust theory of real property when a local church joins a church hierarchy. 256 N. E. 2d 212 at 217.
8. See footnote 2, *supra*.

property by religious corporations; (2) express language of the deeds by which the property was conveyed to the local church corporation; (3) language of the charter of the local church corporation; and (4) provisions of the constitution of the general church body pertinent to the ownership and control of church property.

The United States Supreme Court in its per curiam opinion dismissing the appeal in *Sharpsburg* (1970), 396 U. S. 367, looked with favor upon the principles considered by the state court and found that the Maryland court's resolution of the dispute "involved no inquiry into religious doctrine." 396 U. S. 367, 368. While the *Sharpsburg* opinions did not discuss "implied trust" since that doctrine is not a part of the law of Maryland (See 254 A. 2d 162 at 165), such approach was countenanced in Mr. Justice Brennan's concurring opinion, in which Mr. Justice Douglas and Mr. Justice Marshall joined, where it was said:

". . . that a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." 396 U. S. 367, 368.

The Court of Appeals of Maryland again spoke concerning proper inquiry into church property disputes in *Polen* v. *Cox* (1970), 259 Md. 25, 267 A. 2d 201. The court said:

"The relevant inquiry must be whether the court can re-resolve the *property dispute* on the basis of neutral principles of law which do not involve the resolution *by the court* of ecclesiastical issues.

\* \* \*

"The standard [to be applied to the dispute] must be whether the parties by the acts and documents which have governed their relationship have made it possible for a civil court to resolve control of property without the court itself having to make ecclesiastical determinations. This we think was the message of *Presbyterian*[9] when it stated:

9. The reference to *Presbyterian* is to *Presbyterian Church* v. *Hull Church* (1969), 393 U. S. 440, *supra*.

'Hence States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.' 393 U. S. at 449, 89 S. Ct. at 606." 267 A. 2d 201, 204, 205.

## CHURCH DISCIPLINE, AS IT REFERS TO CHURCH PROPERTY, MAY BE A NEUTRAL PRINCIPLE OF LAW

Whether the "discipline" of the church, as it pertains to property of local churches, can be considered a neutral principle of law is a question not fully settled in Indiana. It was held in *The Ind. Annual Conf. Corp.* v. *Lemon* (1956), 235 Ind. 163, 167, 131 N. E. 2d 780, that where a local church of a larger church organization is dissolved or abandoned, the church property vests in the superior or larger organization of that faith if the Church Discipline, by-laws or regulations so provide. But in *Merryman* v. *Price* (1970), 147 Ind. App. 295, 259 N. E. 2d 883, 893, this court stated that the effect of the *Hull* case was to deny the implied trust theory insofar as it was "based upon principles of ecclesiastical law, church doctrine, or church *discipline.*" (Emphasis supplied) The Indiana Supreme Court, however, in *Smart* v. *Indiana Yearly Conf. of Wesleyan Meth. Ch.* (1971), 257 Ind. 17, 271 N. E. 2d 713, relied on the *discipline* of the church to determine if an implied trust applied to the property in question.

It should be noted that the seeming conflict in the use of the term "discipline" in the *Merryman* and *Smart* cases is more apparent than real. In *Merryman,* Judge Sharp's use of that term is in obvious reference to those general categories of church affairs into which the *Hull* case permits no civil incursion. On the other hand, the examination of the "discipline" by the Supreme Court in the *Smart* case did not require ecclesiastical determinations or raise doctrinal questions clearly proscribed by the *Hull* case.

In light of the recent cases of the United States Supreme Court, and the various state decisions, *supra,* and in light of

the relevant Indiana cases, when considered in their proper context, it seems clear that reference by a court to those sections of a controlling church discipline which pertain to the holding of church property either upon affiliation with or withdrawal from a parent church body is embraced in the concept of neutral principles of law. Thus, where the reference is restricted and does not involve ecclesiastical inquiries, it is not violative of the establishment clause of the First Amendment.

Consistent with the admonition to religious organizations in the *Hull* case, to structure their relationships "so as not to require the civil courts to resolve ecclesiastical questions." the church in *Pilgrim Holiness Ch.* v. *First Pilgrim Holiness Ch.* (1969), 115 Ill. App. 2d 448, 457, 252 N. E. 2d 1, 6, held:

> "In this case the corporate charter and the church manual to which it specifically refers clearly structured the relationship to place ultimate control of the church property in the general church so that a local church withdrawing from the general church relinquished any claim to control of the church property."

The United Methodist Church in the case before us is similarly structured.

### APPLICABLE NEUTRAL PRINCIPLES DISCLOSE IMPLIED TRUST

In the matter presently before the court it seems clear that substantial evidence exists which, according to neutral principles of law, establishes that an implied trust in favor of the appellants was intended by the local church and that it was in fact established. Evidence was presented in the trial court that the appellee church was affiliated with a parent church in a hierarchical organization, that the local church sent representatives to conferences, that the local church accepted free Sunday School literature, that it also accepted duly ordained ministers trained at the expense of the parent church

and that it ordered other literature from the parent church, and that it dutifully filed certificates of election of trustees which indicated the true relationship of the local church to the parent church.

In 1942, a certificate of election was filed by the District Superintendent, naming the duly elected trustees of the four Methodist Churches in the Taylorsville charge, Columbus District:

> "This is to certify that the following are the duly elected trustees of the Taylorsville charge, Columbus District, Indiana Conference, Methodist Church. They are elected according to the laws of the Methodist Church and the State of Indiana.
> "These trustees are Trustees of all Church Property held by the church named below:
> \* \* \*
> TAYLORSVILLE METHODIST CHURCH
> \* \* \*
> ST. LOUIS CROSSING METHODIST CHURCH
> \* \* \*
> CLIFFORD METHODIST CHURCH
> \* \* \*
> OLD ST. LOUIS METHODIST CHURCH
> \* \* \* "

In 1939, in a certificate of election of trustees for the church and parsonage of the appellees filed by the District Superintendent and the Secretary of the Quarterly Conference, the language was as follows:

> "The above trustees shall hold all property of the church of the Methodist Episcopal Church before the Uniting Conference."

For the years 1951, 1956, 1959, 1960, 1961, there were filed in Bartholomew County certificates of election of trustees for the church property which contained the following form language:

> "The property indicated [to be held in trust] is a part of the ———— charge, ———— District, Indiana Conference of the Methodist Church, legal successor of the

Methodist Episcopal Church, the Methodist Episcopal Church South, and the Methodist Protestant Church.

"These trustees were elected according to the law and usage of the Methodist Church and the State of Indiana, at a regular meeting of the ————— Quarterly Conference, held at —————, Indiana, on the ——— day of ———, 19—."

An alternate form was used in the years 1963 through 1968:

"I, —————, the qualified and acting ————— of ————— do hereby CERTIFY that at the ——— Conference of said organization held in accordance with law and the canons of The Methodist Church on the ——— day of —————, 19——, the following were elected as members of the Board of Trustees. . . .
                    *    *    *    *

"I further CERTIFY that under the canons, rules and regulations of The Methodist Church each Trustee serves until the end of the Conference year in which his term expires. . . ."

The understanding between the local and parent churches could not have been more expressive than that contained in a certificate for change of name which was filed in April of 1968 by Paul Land, duly elected and Acting President of the Board of Trustees of St. Louis Crossing Methodist Church. It contained the following resolution as duly adopted by the church members:

"WHEREAS, The Methodist Church and the Evangelical United Brethren Church are being legally and ecclesiastically merged under the name of The United Methodist Church, and

"WHEREAS, *St. Louis Crossing* Methodist Church of *St. Louis Crossing,* State of Indiana, has been a local church of The Methodist Church, and by virtue of said merger is to become a local church of The United Methodist Church, by reason of which its legal name should be changed,

"NOW THEREFORE, be it resolved by the members of said *St. Louis Crossing* Methodist Church, in meeting assembled, due notice of the time, place and purpose of said meeting having been given, that the name of said Church

be, and the same hereby is, changed to *St. Louis Crossing* UNITED METHODIST CHURCH, effective June 1, 1968.

\* \* \* \*

"And the undersigned further certifies that the church premises and the parsonage premises held by the Board of Trustees of said church and situated in said County, are held in trust:

a) that said church premises shall be used, kept and maintained as a place of divine worship of the United Methodist Ministry and members of the United Methodist Church, and

b) that said parsonage premises shall be held, kept and maintained as a place of residence for the use and occupancy of the Ministers of the United Methodist Church who may from time to time be entitled to occupy the same by appointment;

All subject to the discipline, usage and ministerial appointments of said church as from time to time authorized and declared by the General Conference and by the Annual Conference within whose bounds the said premises are situated."

Finally, the affiliation of the local church with the parent church and the obvious legal implications of that relationship were made clear by Finding of Fact No. 13:

"13.   That the by-laws, rules and regulations of the United Methodist Church which applied to the sale of the church property are contained in *The Book of Discipline of the United Methodist Church, 1968.* That paragraph 1503-5 (Defendants' Exhibit Q-1) provides as follows:

" '5.   However, the absence of a trust clause stipulated in Secs. 1, 2, 3 or 4 above in deeds and conveyances previously executed shall in no way exclude a local church or church agency from or relieve it of its connectional responsibilities to the United Methodist Church. Nor shall it absolve a local congregation or church agency or Board of Trustees of its responsibility and accountability to The United Methodist Church; *provided* that the intent and desires of the founder and/or the larger congregations or Boards of Trustees are shown by any or all of the following indications: (a) the conveyance of the property to the trustees of a local church or agency of any predecessor to The United Methodist Church; (b) the use of the name, customs and polity of any predecessor to The United Methodist Church in such a

way as to be thus known to the community as a part of such denomination; (c) the acceptance of the pastorate of ministers appointed by a bishop or employed by the superintendent of the District or Annual Conference of any predecessor to the United Methodist Church.' "

To the degree that such "discipline" defines the respective interests in church property which result from affiliating for mutual interests, we find consideration thereof entirely proper and devoid of First Amendment objection.

## DETERMINING APPELLEES TO BE INDEPENDENT CHURCH WAS ERRONEOUS CONCLUSION OF LAW

The trial court, in its Findings of Fact Nos. 17-21, found the appellees to be an independent church body which maintained control over its property throughout its affiliation with the appellants. It thus found that a church body could affiliate for some reasons—agree to abide by some conditions of affiliation—and yet refuse to affiliate for other reasons. The law, it maintained, was with the appellees.

We think it obvious that the evidence overwhelmingly shows an affiliation between appellants and the appellees in the format of a hierarchical organization; that the trial court was wrong as to its Findings of Fact concerning the independence of the appellees; and that the trial court misconstrued existing law regarding church property disputes. A local church, if it desires to remain independent of the influence of a parent church body, must maintain this independence in the important aspects of its operation—e.g., polity, name, finances. It cannot, as here, enter a binding relationship with a parent church which has provisions of implied trust in its constitution, by-laws, rules, and other documents pertaining to the control of property, yet deny the existence of such relationship. It does not matter whether such agreement to be bound is memorialized. A local church cannot prosper by the benefits afforded by the parent, participate in the functioning of that body, yet successfully disclaim affiliation

when the parent acts to the apparent disadvantage of the local, so as to shield from equitable or contractual obligation the valuable property acquired by the local church either before or during such affiliation.

The decision of the trial court is reversed and the cause remanded for judgment consistent herewith.

Buchanan, Lowdermilk, and Robertson, JJ., concur.

NOTE.—Reported in 276 N. E. 2d 916.