EMBERRY COMMUNITY CHURCH and Thomas Worth and Oliver Critchfield, Individually and as Trustees of Emberry Community Church, Appellants-Defendants,

v.

BLOOMINGTON DISTRICT MISSIONARY AND CHURCH EXTENSION SOCIETY, INC., an Indiana Not-For-Profit Corporation, Appellee-Plaintiff.

No. 1–1284A303.

Court of Appeals of Indiana,
First District.

Aug. 28, 1985.

Mary M. Runnells, Bloomfield, for appellants-defendants.

Geoffrey M. Grodner, Law Offices of Geoffrey M. Grodner, Professional Corp., Bloomington, and Basil H. Lorch, Jr., Lorch, Moyer, Gesenhues & Bitzegaio, New Albany, for appellee-plaintiff.

ROBERTSON, Judge.

The defendant-appellants Emberry Community Church and Thomas Worth and Oliver Critchfield, individually and as trustees of the Emberry Community Church, hereafter collectively referred to as Church, appeal from a bench trial judgment in ejectment in favor of the plaintiff-appellee Bloomington District Missionary and Church Extension Society, Inc., hereafter referred to as District, and finding against the Church on their counterclaim alleging adverse possession of the subject real estate, ownership of the real estate, and seeking quiet title.

The issues raised by the Church are:
1. Whether the trial court properly admitted hearsay testimony from a witness as to her remote ancestors;
2. Whether under the facts presented the District acquired title to the real estate occupied by the Church either of record or through the doctrine of implied trust;
3. Whether the Church acquired title to the real estate either from the remote grantor or from the District through adverse possession; and,

4. Whether laches bars the District from asserting its alleged right to eject the local church from the real estate.

The court on appeal views the evidence and all reasonable inferences to be drawn therefrom in a light favorable to the judgment. *First Nat. Bank of New Castle v. Acra,* (1984) Ind.App., 462 N.E.2d 1345.

A statement of facts viewed in that perspective shows that the Church was built in 1873 and dedicated as the Blooming Grove Church. In 1875 or 1876, it was rededicated and renamed in honor of Bishop Embury (Emberry).[1] In 1871, a forty acre tract was deeded to Lutisha (Letitia) Malicia Neal. In 1885, Lutisha and Enoch Neal deeded the property to one Archibald McCullough, however, this deed description called for only 39 acres. Subsequent conveyances of the property in 1894 and 1902 specifically excepted one acre off of the northwest corner of the tract. The one acre tract is the location of the church. A 1912 deed conveying a twenty acre tract involving the same real estate contained a clause which stated "except one-half acre in the northwest corner of said tract which was deeded to the Emberry M.E. [i.e. Methodist Episcopal] Church". A 1917 deed for coal rights contained an identical exception.

In 1979, the United Methodist South Indiana Conference, Inc. deeded the one acre tract to the Bloomington District Missionary and Church Extension Society (District). There is no record of any title of the real estate being vested in the 1979 grantor. In 1983, Lennice Neal Aucoin and Shirley Neal Myers, as the sole surviving descendants of Lutisha Neal, executed a quitclaim deed to the District. The quitclaim deed was accompanied by an heirship affidavit. There is no deed in the chain of title to Aucoin and Myers.

Minutes of the Annual Conference of the Methodist Church contain information regarding Embury Church from 1882 until 1941 and from 1961 until 1969. In addition to amounts of money paid from the Church to the District, there were also the names of pastors and lay leaders in alter years. The Church shared a minister with the Jasonville Methodist Church for a time. On five occasions between 1951 and 1963, certificates of election of trustees were recorded with the Greene County Recorder. These certificates showed an affiliation with the Methodist Church (District) and that the elections were conducted according to the District's rules.

In 1970, the District formally voted to abandon and discontinue the Church. Abandonment procedures are governed by the Book of Discipline. District records show ministers assigned to the Church through 1969 and that Methodist ministers stopped going to the Church in about May, 1969, with the one exception of a Methodist minister conducting services as a guest. Services continued at the Church with two Sunday services still being conducted by others at the time of trial. The fact that services were being held was known in the community. The Church hired ministers, including a lay Methodist who conducted services without the sanction of the District. In July, 1966, Donald Pierce called the District Superintendent, in the belief that the Church was affiliated with the Methodists, regarding use of the Church for revivals. The Superintendent said the Church was no longer affiliated with the Methodists and that it was on its own. Because Pierce was a lay minister, the Superintendent suggested that baptisms would not be appropriate.

Materials purchased from donations and labor donated by members caused numerous improvements in the Church building since 1967. The Church filed for tax exemptions in 1980, as a Methodist Church and in 1983, as "Embury Community Church", although the trustee who made the filing did not think it was a Methodist Church.

The present controversy was precipitated by a coal company's offer to buy the property from the District.

1. Over the years the Church was progressively called the Emberry M.E. Church, the Embury Methodist Church, and the Embury United Methodist Church.

ISSUE ONE:

In this issue the Church argues that the trial court erred in finding that the District had record title. On the one hand, it is argued that testimony by Shirley Neal Myers was inadmissible hearsay and did not come under the pedigree exception to that evidentiary rule. The purpose of this argument is to void the 1983 Aucoin/Myers quitclaim deed to the District. Alternatively, it is argued that the 1979 deed from the Conference to the District could not confer title because there is nothing in the record or the chain of title to show that the Conference had title to the real estate which it could convey.

The Church takes exception to the following testimony of Shirley Neal Myers:

Q. And who was your father?

A. LeRoy James Neal.

. . . . .

Q. Okay and who was your grandfather?

A. Walter Neal.

Q. And who was your great grandfather?

A. Enocks [sic] Neal.

Q. And Enocks Neal was married to [whom]?

A. Laticia [sic].

Q. So then Laticia Neal was your great grandmother is that correct?

A. Yes.

. . . . .

Q. Alright. Mrs. Myer [sic] how many children were born to the marriage of Enoch Neal and Latrica [sic] Neal?

. . . . .

A. Four.

Q. Do you know their names?

A. Walter my grandfather, James, I think Minnie and [Lennie].

Q. Have you had occasion during any time of your life time to research the family history, your family history?

A. It had been done yes.

Q. Do you know whether or not Minnie Neal had any children?

A. I don't believe so.

Q. Do you know whether or not Lennie Neal had any children?

A. No.

Q. Are Minnie Neal and Lennie Neal both deceased?

A. Yes.

Q. [D]o you know whether James W. Neal had any children?

A. No.

Through this testimony, Mrs. Myers sought to establish that she and Lennice Neal Aucoin were the sole surviving descendants of Lutisha Neal. The Church contends that the testimony constituted hearsay which was inadmissible even under the pedigree exception. The Church's contention fails on two counts.

First, the testimony of Mrs. Myers was not hearsay. A witness may testify as to the facts of family history which relate to him. 29 Am.Jur.2d *Evidence* § 514; 31A C.J.S. *Evidence* § 226. The witness whose knowledge of family matters was derived from intimate acquaintance with the family may testify as to facts of family history, because the testimony more closely resembles personal knowledge than mere hearsay. 31A C.J.S. *Evidence* § 226.

Further support for the admissibility of Mrs. Myers' testimony is found in *Crawley v. Selby*, (1951) 208 Ga. 530, 67 S.E.2d 775. The plaintiffs in that case were required to prove that they were the only heirs at law of the deceased. Mrs. Selby, one of the plaintiffs, testified that the deceased was her mother's brother; that he died leaving no wife, children, descendants of children, brothers or sisters; and that she and her sister were the only children of the deceased's brothers and sisters. The court ruled that the testimony was admissible.

To arrive at its decision, the *Selby* court distinguished between declarations of a declarant and testimony of a witness:

[A] declaration is an unsworn statement made by a party to a transaction, or by one having an interest in the existence of some fact in relation to the transaction. Testimony, on the other hand, is the statement made by a witness under oath or affirmation. The statements here under consideration are, therefore, testimony rather than declarations, since they were made under oath in a judicial proceeding. The rules relating to declarations are not applicable.

67 S.E.2d at 780 (citations omitted).

The court concluded that it was proper for the witness to testify about matters of general repute and tradition in her family.

■ Similarly, it was proper for Mrs. Myers to testify about the facts of her family history. The Church stresses that Mrs. Myers' independent recollection of family history was lacking and that she relied in part upon a genealogist's report. These purported deficiencies could conceivably weigh against Mrs. Myers' credibility as a witness, but her testimony remains admissible.

■ Even if Mrs. Myers' testimony had constituted hearsay, the evidence would have been admissible under the pedigree exception to the hearsay rule. The Church's argument to the contrary is based upon language in *State v. Schaller*, (1942) 111 Ind.App. 128, 40 N.E.2d 976, suggesting that proof of pedigree is restricted to the declarations of deceased persons. Mrs. Myers stated that she discussed her family history with her mother prior to her mother's death. Thus, Mrs. Myers' testimony, founded upon declarations of her deceased mother, was admissible under the *Schaller* formulation of the pedigree exception.

The Church contends that Mrs. Myers' testimony was rendered inadmissible by her reliance upon a genealogist's report. However, more recent commentaries are increasingly liberal in their approach as to the source of the hearsay evidence. The Uniform Rules of Evidence would allow as admissible hearsay evidence which is

A statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, marriage, ancestry, or other similar fact of personal or family history, even though declarant had no means of acquiring personal knowledge of the matter stated;

Uniform Rules of Evidence § 804(4)(i), 13 U.L.A. 340. The Federal Rules of Evidence, Rule 803 provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... (13) *Family records*. Statements of fact concerning personal or family history contained in family Bibles, *genealogies*, charts, engravings on rings, inscription on family portraits, engravings on family portraits, engravings on urns, crypts, or tombstones, or the like....

Fed.R.Evid. 803(13) (emphasis added).

A third authority observes that the firsthand knowledge of the in-court declarant is often not enforced and that it is unnecessary to show that the declarant had firsthand knowledge of the facts. McCormick on Evidence, 2d Ed. § 322 at p. 746. Based upon these authorities, we conclude that Mrs. Myers' reliance upon a genealogist's report did not render her testimony inadmissible hearsay.

The Church's attempts to exclude Mrs. Myers' testimony were properly rejected by the lower court. Consequently, the Church's efforts to void the 1983 Aucoin/Myers quitclaim deed to the District must fail.

ISSUE TWO:

In its second issue, the Church shifts its attention from the 1983 Aucoin/Myers quitclaim deed to the 1979 deed. According to the Church, the 1979 deed from the Conference to the District conveyed nothing, because the Conference never held title to the real estate. The Church rejects the doctrine of implied trust and contends that under the circumstances, the law recognizes title as being in the Church.

■ An implied trust is created by implication of law based upon the presumed intention of the parties or based upon equitable principles independent of the particular intention of the parties. *Holsapple v. Shrontz,* (1917) 65 Ind.App. 390, 117 N.E. 547. The United States Supreme Court indicated in *Watson v. Jones,* (1871) 80 U.S. (13 Wall.) 679, 20 L.Ed. 666, that the property held by a local congregation may be held by implied trust for a general church depending upon the relation found in fact to exist between the local and general churches. Thus, if the Church acquired title to the real estate through adverse possession and cut off Aucoin and Myers, the doctrine of implied trust could operate to place title in the Conference.

The Church asserts that its relationship with the Conference was insufficient to support an implied trust. The relationship between two churches claiming the same church property can only be determined when the polity of the denomination is known. *United Methodist Church v. St. Louis Crossing Independent Methodist Church,* (1971) 150 Ind.App. 574, 578, 276 N.E.2d 916, 918–19. The types of church polity may be characterized as either congregational or hierarchical. *Id.* at 580, 276 N.E.2d at 919. In the congregational form, each congregation is self-governing. *Id.* A hierarchical church is generally one in which authority is exercised by laymen and ministers organized in an ascending succession of judicatories. *Id.* A hierarchical polity serves as the foundation for the implied trust theory of property control. *Id.* at 579, 276 N.E.2d at 919.

■ The evidence most favorable to the judgment supports the conclusion that the Church and the Conference shared a hierarchical relationship. The Church paid money to the Conference and elected its trustees pursuant to the cannons, rules and regulations of the Conference. The Conference maintained records of the Church's membership and its pastors. From 1875 to 1970, including the period of adverse possession which allegedly cut off title in Aucoin and Myers, the Church was part of a hierarchical denomination. The property held by the Church was held by implied trust for the Conference.

■ As an alternative argument, the Church proposes that title reverted to it when it was abandoned by the Conference in 1970. However, where a local church of a larger church organization is dissolved or abandoned, the church property vests in the larger or superior organization of that faith if the Church Discipline, by-laws or regulations so provide. *Ind. Annual Conf. Corp. v. Lemon,* (1956) 235 Ind. 163, 167, 131 N.E.2d 780, 784.

The Book of Discipline of the United Methodist Church, admitted into evidence in the instant case, described the abandonment procedure to be employed by the Conference:

> [T]he Annual Conference may declare any local church within its bounds discontinued or abandoned. It shall be the duty of its Board of Trustees to make such disposition of the property thereof as the Annual Conference shall direct; and if no such lawful trustees remain or if for any reason said trustees fail to make such disposition, then it shall be the duty of the trustees of the Annual Conference to sell or dispose of said property in accordance with the direction of the Annual Conference....

> All the deeds, records, and other official and legal papers of a church that is so declared to be abandoned or otherwise discontinued shall be collected by the district superintendent in whose district said church was located and shall be deposited for safe keeping with the secretary of the Annual Conference....

> Any gift, legacy, devise, annuity, or other benefit to a pastoral charge or local church that accrues or becomes available after such charge or church has been discontinued or abandoned shall become the property of the trustees of the Annual Conference....

*Book of Discipline of the United Methodist Church,* 1968, ¶ 1550.

According to the Church Discipline, the Conference was to hold the deed to the church property and direct the disposition of the property. These provisions support the conclusion that the property vested in the Conference when the Church was abandoned.

For its third issue, the Church asserts that even if at one time the Conference had title to the property, that title was cut off by the Church's adverse possession. Because the Church is appealing from a negative judgment on this issue, the Church must show that the evidence is without conflict and that it leads to but one conclusion which was not reached by the trial court. *See Ford v. Eckert,* (1980) Ind.App., 406 N.E.2d 1209, 1210.

Title to real estate may be defeated by adverse possession where the possession has been actual, visible, notorious, exclusive, under a claim of ownership, hostile to the true owner, and continuous for the statutory period. *Dowell v. Fleetwood,* (1981) Ind.App., 420 N.E.2d 1356, 1359. Provided the occupant does not disavow the right to possession of the property or acknowledge that the possession is subservient to the title held by the true owner, the possession is adverse or hostile. *Id.*

The Church initially occupied the property at issue as a local congregation of the Conference. Possession of the property was in subordination to the Conference's title. The Church contends that its continued occupancy after it was abandoned by the Conference constituted adverse possession. However, where entry upon the land has been in admitted subordination to the title of another, the statutory period for adverse possession does not begin to run until the occupant clearly and unequivocally disclaims the title of the true owner. *Poole v. Corwin,* (1983) Ind.App., 447 N.E.2d 1150, 1152. Any disclaimer by the Church was rendered equivocal by the forms filed for tax exemptions on which the Church indicated its affiliation with the Conference. Therefore, the evidence did not lead inescapably to the conclusion that the Church had defeated the Conference's title through adverse possession.

The final issue raised by the Church involves a claim of laches. The Church argues that the delay by the District in asserting its claim to the real estate barred the District's ejectment action.

Laches is defined as the neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. *Haas v. Holder,* (1941) 218 Ind. 263, 272, 32 N.E.2d 590, 593. The question of laches is addressed to the sound discretion of the trial court and is reviewable upon appeal only for an abuse of that discretion. *Citizens National Bank of Grant County v. Harvey,* (1976) 167 Ind.App. 582, 339 N.E.2d 604.

The Church has failed to demonstrate an abuse of the trial court's discretion. The District acquired title to the subject real estate in 1979. That same year, the District filed suit claiming ownership of the church property. The suit was dismissed. In 1980, the District again filed suit to quiet title in the land. The second suit was dismissed in 1983. The instant action was brought on January 16, 1984. Hence, the District did not sleep on its rights; it took steps to make its claim known. The trial court did not abuse its discretion by finding that laches was not available to the Church.

Judgment affirmed.

RATLIFF, P.J., and NEAL, J., concur.