## PEARL-MARKET BANK & TRUST CO v EDWARD D WOODWARD CO et

Ohio Appeals, 1st Dist, Butler Co

No 641. Decided May 27, 1935

Paxton & Seasongood, Cincinnati, and Harry J. Koehler, Jr., Hamilton, for plaintiff.

Dolle, O'Donnell & Cash, Cincinnati, George E. Fee, Cincinnati, and John Andrews, Hamilton, for the Superintendent of Insurance of the State of Ohio.

## OPINION

By MATTHEWS, J.

This is an appeal from a judgment rendered by the Court of Common Pleas of Butler County upon issues raised by the cross-petition of the State Superintendent of Insurance on behalf of The Union National Life Insurance Company, an intervenor, against the plaintiff, The Pearl-Market Bank & Trust Company, its answer and the reply thereto. These parties will be called Insurance Company and Trustee respectively in this opinion.

The Trustee instituted this action in foreclosure of a mortgage under the terms of which it—mortgagee— was trustee to secure a bond issue. The Insurance Company intervened in this action, and, by way of cross-petition against the Trustee, alleged that it had received and applied on the mortgage debt sums of money aggregating $2741.25, which it knew or should have known at the time belonged to the Insurance Company and was being converted without authority, to the personal use of its agent Edward D. Woodward. The Insurance Company prayed to be subro-gated to the rights of the Trustee in the real estate.

Edward D. Woodward was the general agent of the Insurance Company at Cincinnati. As such he solicited life insurance business, collected premiums on policies issued by his principal and interest on loans made by it. In addition he participated in the making of loans by the Insurance Company, and his status in so doing is one of the issues in this case.

Woodward was a director and vice-president of the Insurance Company and knew that it had money to invest, and by virtue of his official position had some voice in the manner of investing it. The policy of loaning on real estate mortgage security was adopted and Woodward was permitted to submit applications for loans as agent for the applicants, and in the event the loan was made, the borrower, to the knowledge of the Insurance Company, paid to him whatever compensation he received for his services in connection with the loan. The Insurance Company paid him nothing in that connection. If the loan was approved by the authorized officials of the Insurance Company, Woodward undoubtedly was made the agent of the Insurance Company for the purpose of seeing that the Insurance Company did not lose control of the money before securing a first lien upon the real estate by a validly executed and recorded mortgage. The method pursued to accomplish this was for the Insurance Company to send the checks to Woodward, payable to the borrower. If the title to the real estate was clear and absolute in the borrower, the only condition—so far as the Insurance Company was concerned—to the delivery of the check to the borrower, would be the execution and recording of the mortgage. But, before a first mortgage could be given, it might be necessary to cancel some existing liens; and use of the money loaned, represented by the check, might be necessary for that purpose. The Insurance Company must have contemplated that, but if it made any arrangement or gave any directions as to how it should be done the evidence fails to show it.

Woodward opened a checking account in the name of "Edward D. Woodward General Agent Gem City Life Insurance Company" in The First National Bank & Trust Company at Hamilton, Ohio, apparently on his own initiative. There is no evidence that Woodward had a fraudulent intent in opening this account. The record does not show that the Insurance Company required that he open such an account, or had any advance notice of his intention so to do. However, it is entirely clear that

shortly thereafter it learned by the indorsements on checks issued by it, payable to the borrower, that he was having checks indorsed to him in that style and was so indorsing them to this bank. Prior to the date when the Trustee accepted the checks in question, Woodward gave a check upon this account to the Insurance Company's president for his individual purpose. This occurred at a meeting of the directors of the Insurance Company after the subject-matter had been discussed among the directors. In all the instances of loans handled by Woodward after the opening of this bank account, he had the borrowers indorse the checks and then he deposited them in this bank account. This bank account was limited to deposits of money received from the Insurance Company to be paid to others, and money received from others to be paid to it in settlement of premiums and interest. It is clear that all of this money was received by Woodward in a representative capacity, either as agent of the Insurance Company or as agent of the borrowers, with the exception of the check for $2000.00, which was ostensibly in payment of a personal advancement made by him for the Insurance Company. He concededly received the premiums and interest as agent of the Insurance Company. We think the Insurance Company must be charged with knowledge of this bank account and that Woodward was commingling his individual funds in it and checking against it for his individual purposes.

The books of The Edward D. Woodward Company show that there was an attempt, at least, to keep the cash transactions of "Edward D. Woodward, General Agent," "The Edward D. Woodward Company," and "Edward D. Woodward" individually, separate and distinct upon the record. Edward D. Woodward, however, did draw upon the "General Agent" account for his individual purposes. Neither the Trustee nor the Insurance Company knew anything about the books of The Edward D. Woodward Company.

It is clear that had Woodward faithfully performed his duty as agent, he would have been entitled to a rather small amount, compared to the total, as commissions for his services. The Insurance Company must have known that these commissions were in these accounts and must have thought Woodward was entitled to them. Aside from that, the money in the bank account in The First National Bank & Trust Company at Hamilton did not belong to Woodward. He was for the purposes of remedy at least, a trustee for the equitable owner or owners.

It is claimed by the Insurance Company that it was the equitable owner of this bank deposit, that the form of the signature—"Edward D. Woodward General Agent Gem City Life Insurance Company"—was notice to the Trustee—The Pearl-Market Bank & Trust Company—of such ownership, and that, therefore, it has the right to follow this money into the real estate and to be reimbursed from the proceeds of its sale.

The first task then is to determine the ownership of this fund. We think we are justified in assuming that, in view of the actual as distinguished from the apparent situation, Woodward had no beneficial interest in it. If, under other circumstances he would have been entitled to some part on account of services, we think his conduct prevents such right from attaching to the prejudice of the equitable owner. Restatement of Law of Agency, §469. Furthermore, if he was acting as agent of the Insurance Company in handling the money intended for borrowers, no right to commissions out of it could accrue to him until the title to the fund passed from the Insurance Company to the borrower. So, as between Woodward and his principal or principals, the equitable title must have rested with either the Insurance Company or the borrowers at the times when these checks were given to the Trustee by Woodward. The Insurance Company claims that it had title. On the other hand, the Trustee claims that Woodward did not represent the Insurance Company in the handling of this money obtained by having the borrowers indorse the checks made payable to them by the Insurance Company, that the checks were the property of the borrowers and the money which they represented was likewise the property of the borrowers. Of course, if the Insurance Company had no title, it must fail in this action, no matter what else may appear.

Now what was the intention of the parties as shown by this recital of facts? We start with this money in the bank of the Insurance Company, upon which its checks payable to the borrowers were drawn. It was the property of the Insurance Company at that time, and it continued to own it unless and until it, by some act, divested itself of the title. The drawing of the checks did not have that effect. Sending the checks to Woodward did not change the situation. Nor did

that create even a personal liability on the part of the Insurance Company on the checks in favor of the payee. Until delivery of the checks to the payees, they were ineffective entirely as legal documents to transfer title or create a personal liability. And sending the checks to Woodward was not a delivery to the payees. Delivery of the checks by Woodward to the payees would create a personal liability on the Insurance Company in favor of the payees, provided Woodward was authorized to make the delivery, and his authority depended on whether the payees had performed the conditions entitling them to the money for which the checks were drawn. The payees necessarily knew that he had no authority to deliver under any other circumstances. Permitting or requiring the payees to indorse the checks, so as to make the money available in the hands of Woodward for the discharge of existing liens would not, we believe, have the legal effect of transferring the title to either the check or the fund because that was not the intention. In the presence of existing liens and inability of the borrower, without aid from the lender, to remove them, a shift in the plan became necessary. To complete the loan, it became necessary to draw the lender's money from the home bank to the place where the loan was being consummated. The Insurance Company's order, in the form of the check, was available, only requiring the indorsement of the payee. That was the simplest way and it was resorted to, not for the purpose of transferring title, but to assist in the performance of the conditions precedent to the transferring of title. Had Woodward and the payee expressly agreed to waive the conditions, it would have been ineffective, as it would have been, to the knowledge of the payee, a violation of duty by the agent. We conclude that as between Woodward, the Insurance Company, and the borrowers, the net proceeds of these checks in the bank in the name of "Edward D. Woodward General Agent Gem City Life Insurance Company" belonged in equity to the Insurance Company.

But, it is said, there are decisions interpreting similar facts to the contrary legal effect.

In Virginia-Carolina Joint Stock Land Bank v Liles, 197 N. C., 413, 149 SE, 377, the title to the land had been represented by the borrower to be free, clear, and unincumbered, and he had executed a mortgage warranting it to be so. The lender relied on the representation and warranty, and sent the check. So far as the lender knew, there was no condition to be performed prior to the delivery of the check to the borrower. The duty not to deliver the check resulted not from any lack of authority, but because of fraud and collusion on the part of the agent and the borrower. It is true that the check was payable to the agent and the borrower jointly, but that is only one circumstance. The question of agency and authority must be answered by a consideration of all the circumstances. This is recognized in the opening paragraph of the opinion: "The question involved, as contended by defendant: 'Is there sufficient evidence to show that Matthews was acting as agent of the plaintiff in the receipt and disbursement of the proceeds of the loan made to Liles?' We think not, under the facts and circumstances of this case." The facts and circumstances, we think, clearly distinguish that case from the case at bar.

In Ridgefield Sav. Bank v Sherwood, 91 Conn. 648, 100 Atl., 1063, the defaulter was employed by the borrower, had no relation to the lender, and was clearly acting for the borrower in receiving the money.

Trustees of Synod of Reformed Presbyterian Church v Livingston, 210 Pa., 536, 60 Atl., 154, is similar to Virginia-Carolina Bank v Liles, supra, as is Kirkpatrick v Warden, 118 Va., 382, 87 SE 561.

In Atlantic Life Insurance Co. v Rowland, 22 Fed. (2d) 126, the absconding attorney bore no other relation to the lender than its attorney in this one transaction, was also equally the attorney for the borrower even in it, and sustained a more intimate relation to him. Furthermore, at the time of the dereliction he was acting under specific instructions from the borrower "to pay up the matter, and pay off all the debts, and bank the balance for me," which the court, at page 129 said "unquestionably made O'Bryan A. P. Burgess' agent, for these particular things mentioned by Burgess." On the same page, the court noticed the apparent conflict in the decisions and made this comment: "But there is no conflict in the authorities as to the fact that each case must be settled according to the peculiar conditions surrounding it, nor could there well be any settled rule or fixed principle applicable to all cases of this character." An imposing array of authorities is listed, holding that under certain circumstances the attorney was the agent of the lender, and an equally imposing array that he was the agent of the borrower. In the former list is the case of Gibson v Davenport, 29

Oh St, 309, in which at page 313, the court says:

"It is but fair to presume that they trusted him to apply this money as had been agreed upon by the parties, by paying so much of it to the attorneys of Stone as would satisfy his mortgage, and paying the balance, less his fees, to Mrs. Davenport, or to F. as her attorney. It can hardly be believed that McBurney & Co. would have consented to pay the whole sum over to Mrs. Davenport, and trust to her or her attorney to make the proper application of it, or that they supposed they were so consenting when they paid the money to Cist, drawing the check in his own name, and apparently leaving it entirely to him to ascertain the amount payable on the mortgage, and the amount to be received by Mrs. Davenport."

So we have concluded that under the facts of this case Woodward was the agent of the Insurance Company in handling the checks and money, and that ▓▓▓▓▓▓ █ the making of the undelivered checks payable to the borrowers and their indorsement of them, does not prove or tend to prove that title thereto passed to the borrowers and that thereafter Woodward was their agent in handling the funds. He remained the agent of the Insurance Company, in possession of its property.

The next question is whether the Insurance Company is in a position to assert its title against the Trustee. We do not deem it germane to consider what words are sufficient to bind a principal on a note executed by an agent. The legal title to the whole of this bank account clearly belonged to Woodward. The Insurance Company's right arose by operation of equitable principles. The contract of the bank was with Woodward. It agreed to honor his checks upon it, and no one else's. The signatures to the checks were that of Woodward, were so intended, and could have created a liability on him and no one else. True, the Insurance Company knew that its money was being deposited in the account, but that did not make it the bank account of the Insurance Company. Had the Trustee inquired of the bank, it would have been told that Woodward General Agent Gem City Life Insurance Company was the depositor. Had recourse been had to the Insurance Company for information, it would have disclosed that the Insurance Company had no account there, but that Woodward did have, with the unlimited authority of an absolute owner to draw against it because that was the Insurance Company's understanding of the situation. Under such circumstances, ▓▓▓▓▓▓ █ the legend must be regarded as descriptio personae. In Robinson v Kanawha Valley Bk., 44 Oh St, 441, a similar legend was held to be descriptio personae. Undoubtedly the legend following the signature gave to the Trustee such notice of existing facts as would be conveyed by the words of the average person, and it would be charged with notice of such facts as are naturally and reasonably connected that would be disclosed by an inquiry fairly pursued. The legend could not convey notice of non-existing facts and the law would not impute knowledge of facts which inquiry would not have disclosed. 20 R.C.L. 348. How could inquiry disclose facts of which the Insurance Company itself was unaware?

In 21 Am. & Eng. Encyc. of Law (2nd ed.) at 588, it is said:

"The omission of the party to make inquiry cannot be material where such inquiry would not have led to a knowledge of the fact with the notice of which it is sought to charge him. The question is whether the inquiry, if it had been made, would have afforded information on any fact material to his rights. If his conduct would have been the same whether he had or had not made inquiry, his omission cannot be a reason for charging him with notice."

See also: Pomeroy on Equity Jurisprudence (4th ed.) Vol. 2, p. 1154; Herbert v Wagg, 27 Okla., 674.

Inquiry, short of a complete audit, would not have disclosed the fact that these checks could only be paid out of funds equitably belonging to the Insurance Company.

In this case the relation between Woodward and the Insurance Company as to this fund was created by acts on his part and acquiescence on its part, without any actual agreement to that effect. It had known for many months that its checks payable to borrowers were being deposited in this bank account. It knew, or at least must be charged with knowing, that after closing each loan transaction there was a residuum, to which Woodward was entitled as commissions. It also knew that commissions on collections deposited in this account remained after he had accounted to it for them. Furthermore, it knew that it had given Woodward a check for $2,000.00 supposing that he had advanced that

amount for it from his personal funds and that this check had been deposited in this account. And in at least one instance—that of the check for $100.00 in payment for stock purchased by him—it knew he had checked against the account for his personal use. We conclude from these circumstances that the Insurance Company knew that Woodward was commingling its fund with his personal funds in this bank account and checking against them for his own purposes. The record does not disclose how much of the deposit was personal and how much Insurance Company money. Of course, the Trustee knew that the checks received by it were proffered in payment of Woodward's personal debt. There was nothing equivocal about his conduct in that respect. Whether between Woodward and the Insurance Company, the latter had some interest in the transaction, the Trustee had no means of knowing. Now knowing all that the form of the signature should have conveyed of the relation between Woodward and the Insurance Company, implied from the acts of the parties, as distinguished from the relation created solely by operation of law, does such knowledge preclude the Trustee from retaining the proceeds of these checks against the demand of the Insurance Company? It seems to us that the most that the notice could have conveyed was that the bank deposit was a fund created by the commingling of Woodward's and the Insurance Company's money, with the latter's consent, upon which Woodward drew checks for his individual use, also with its consent. This would disclose a voluntary confusion of goods.

In 5 R.C.L., p. 1055, it is said:

"It is clear that where a mortgagor has mixed other goods with the goods mortgaged so that they cannot be identified, the mortgagee may take the whole, as against a purchaser who takes subject to the mortgage, or an attaching creditor. If, however, the mortgagee of part of the intermixed goods has permitted or assented to the confusion, the forfeiture of the whole of the goods in favor of an innocent party may be enforced against him as well as against the owner of the goods."

The same result is reached, and, perhaps, more clearly and conventionally, by the application of the principle of estoppel, although, it seems to us, to be the same fundamental principle expressed in a different way. Knowing that Woodward had commingled his and its money and that he was drawing upon this commingled fund for his individual purposes, and remaining silent and inactive about it, it must be assumed that he had authority to draw checks on the fund for his individual purposes. The Insurance Company is estopped to deny it.

In 10 R.C.L., p. 767, it is said:

"And so, recognition by a principal of authority in his agent to draw drafts upon him is an admission of obligation to accept them, and estops him from repudiating liability on such draft, although he had never admitted funds in his hand or other obligation to accept."

and at page 765:

"If one holds out another as his agent, he is estopped to repudiate the acts of such person within the scope of his ostensible authority, * * *."

The actual facts in this case none of which was really known to the Trustee, suggest several questions. May a principal, by holding a person out as his agent in a particular business, cast upon everyone knowing of the agency, but dealing with such person in his individual capacity, the duty of safeguarding the principal against the agent's breach of duty? Or—drawing closer to the facts in this case—if a person advertises himself as the agent of another, with that other's acquiescence, must those dealing with such person, knowing those facts, but dealing with him with reference to a personal matter, assume that he is dishonest rather than honest? Or—stating another phase of the facts in this case—if a principal permits his agent to deposit his money in a bank account in which the agent's own money is also deposited, thereby, and with knowledge, authorizing a commingling of funds subject to withdrawal by the agent and no one else, must a person who receives money from this fund, knowing these facts, take it subject to the duty to make restitution in the event that upon an accounting between the principal and his agent it be disclosed that at the time it was the principal's money? If these questions be answered in the affirmative, then what duty does the principal owe to protect himself? The answer would seem to be that he owes none.

On the other hand, is it not more in conformity to what actually occurs to assume good faith and honest dealing without in-

quiry? The Insurance Company did that The debt is a personal debt. May the creditor not assume that it is being paid by the money of the debtor? And, if later, it be disclosed that the assumption was contrary to the fact, it is not more in consonance with legal and equitable principles to place the loss as between two equally innocent persons upon him who in misplaced confidence put it in the power of the wrongdoer to commit the wrong? In this case it was the Insurance Company that placed the confidence. The most that the Trustee did was to assume that the Insurance Company's confidence was not misplaced. Upon that principle—that whenever one of two innocent persons must suffer by the acts of a third person, he who has enabled such third person to occasion the loss must sustain it—the loss must fall upon the Insurance Company—and this is the fundamental general principle upon which the doctrine of confusion of goods and estoppel rest.

Woodward had authority to draw these checks. No one else was authorized. On no theory that occurs to us did the Trustee violate any duty owing to the Insurance Company by receiving the checks. As to them it must be said that the Trustee acted in good faith, and as they were negotiable instruments, receipt of them in payment of a pre-existing debt was a valuable consideration, both according to the common law (Carlisle v Wishart, 11 Ohio, 172, Eaton v Davidson, 46 Oh St, 355, at 366 and 367), and the Uniform Negotiable Instruments Act (§8130, GC). As we view it, however, the Insurance Company's complaint is that the Trustee received its money under such circumstances that creates an obligation to repay. Now it is trite to say that money has no earmarks.

In the case of Nassau Bank v National Bank, 159 N. Y., 456, money obtained by fraud had been deposited by the wrongdoer and his draft or check given against it. There was involved in the case the question of whether the payee in the draft was fictitious, making it payable to bearer, so as to permit title to pass without indorsement, which question the court found it unnecessary to answer, saying at 459 and 460 on the subject of a pre-existing debt being a sufficient consideratoin to protect an innocent recipient of money, that:

"But it is unnecessary, when the decision of the case may rest upon plain and well-settled legal propositions. The situation may be said to be, in certain aspects, new; but I see no good reason for denying to it the application of the rule that when money has been received by a person in good faith, in the usual course of business and for a valuable consideration, it cannot be pursued into his hands by one from whom it has been obtained through the fraud of a third person. If it has been used, as it is claimed in the present case, to pay an indebtedness owing by the third person, with innocence in the recipient, there is a consideration for its payment by him, which, despite the fraud through which the money was obtained and for reasons based upon policy and the need for such security in ordinary commercial transactions, supports and protects its possession against the world. The following cases establish and will illustrate the application of these principles: Justh v Nat. Bank of Commonwealth, 56 N. Y. 478; Stephens v Board of Education, (79 ib. 183); Hatch v Fourth National Bank (147 ib. 184)."

The result of the cases on this subject of the attributes of money is summarized in the annotation of the case of Randall v Curtis, 12 A.L.R., p. 1040, at 1054, as follows:

"A creditor has a perfect right to accept money in payment of a pre-existing debt from a debtor who perchance may be a trustee or a fiduciary, having the money in trust and engaged in misapplying it by paying his own debt. The creditor in such a case incurs no liability to the beneficial owner by taking the money from his debtor. If he neither participates in nor is privy to the breach of trust, and does not know or suspect wrongdoing. In other words, the creditor is not liable if his status in the transaction is the same as that of an innocent bona fide purchaser of trust property for a valuable consideration."

Many cases from various jurisdictions are cited in support of the statement of law.

In Perry on Trusts (7th ed.), §828-a, it is said:

"At common law the exchange of money or negotiable paper for the extinguishment of or as security for an antecedent indebtedness was considered a transaction for value."

See also: Williston on Sales (2nd ed.), §620; Shuman v Citizens State Bank, 27 N. D., 599; L.R.A., 1915A, 728; Smith v Des Moines National Bank, 107 Iowa, 620; Justh

v National Bank of Commonwealth, 56 N. Y., 478.

We have said that the Insurance Company was the equitable owner of this money in the bank. This equitable title was created not through its volition, but by operation of the law to assist in protecting itself against the wrongdoer. As is said in Bogert on Trusts, §471: "The constructive trust may be defined as the device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. * * * To obtain this end the court constructs a trust. It makes the defendant a trustee by virtue of the decree of the court, for the purpose of working out the ends of justice."

And further along in the same section:

"It is merely a tool of the court to work out an equitable result in the simplest fashion. It is created regardless of the interest of the parties, and naturally directly against the interest of the defendant. As well stated by a learned writer, it is a 'fraud-rectifying' trust and not an 'intent-enforcing' trust."

And, still further along:

"A constructive trust * * *, is a fiction of equity, devised to the end that the equitable remedies available against a conventional fiduciary may be available under the same name and processes against one who through fraud or mistake or by any means ex maleficio acquires property of another."

The trustee's right against Woodward arose ex contractu; the Insurance Company's, ex delicto. Their claims were equally meritorious. By providing different remedies, it was not intended to exalt one above the other. The Trustee exercising the same care and with less knowledge than the Insurance Company, assumed that the legal owner had not so acted as to create equities. Until the Insurance Company asserted its equities, we think the Trustee was justified in assuming that no equities existed against the fund and in receiving payment and disbursing it in good faith in the usual course of business.

The Insurance Company has submitted its claim to a court of equity. It assumed the burden of making it appear that its equity was superior. This, we think, it has failed to do. We find that the Trustee, representing the unpaid bondholders, has the higher equity. It had paid to holders of matured bonds, most of this money long before any question arose about it. At most, the present bondholders received only a small part as interest. We should mention also that while there is proof that Woodward is still indebted to the Insurance Company, there is no proof of the amount of such indebtedness, or proof of inability to determine the total amount.

For these reasons, we find the issues in favor of The Pearl-Market Bank & Trust Company, Trustee.

A judgment entry may be presented carrying this finding into effect.

HAMILTON, J, concurs.
ROSS, PJ, dissents.

### DISSENTING OPINION

By ROSS, PJ.

I regret that I am compelled to dissent from the conclusions of my associates.

This case is presented on appeal. The deciding factor is purely a question of fact. Did the plaintiff have notice of the fiduciary character of the account, upon which the checks of "Woodward General Agent Gem City Life Insurance Company" were drawn. The writer of the opinion concludes that the checks signed "Edward D. Woodward General Agent Gem City Life Insurance Company" was not in itself sufficient to put the plaintiff on notice.

The line of authorities holding words similar to those used in this case merely descriptio personae in most cases apply to attempts to hold the principal upon the signature of the agent, or to cases where the agent is endeavoring to escape personal liability. They are not cases of notice to a payee. See 3 R.C.L., p. 1093, §302.

Every case must stand upon its own peculiar facts.

I am unable to comprehend how anyone receiving such a check in payment of a personal debt would not at once wonder why the drawer of the check used such an account for the purposes involved.

Common caution would inspire an inquiry addressed to the disclosed principal.

It is true that the Insurance Company placed trust in its agent, and is held responsible for the injury he may do to innocent persons. This is just the reason why a stranger must use care in dealing with the agent. Our whole commercial structure is built up on trust and confidence in agents and employees. Invariably

the principal suffers by misplaced faith. It, therefore, becomes the duty of strangers dealing with agents, having the slightest reason to expect treachery to a trust to warn the principal who is always the last to become aware of the breach of faith. The penalty of loss attached to a transaction in which the stranger wilfully ignores a warning sign such as was present here should not be placed upon the principal, unless it is also made to appear that the confidence in the agent was negligently misplaced by the principal.

Any reasonable person would have apprehended a situation requiring explanation.

It is my conclusion that in this case the payee should bear the loss.