SOUTHERN OHIO STATE EXECUTIVE OFFICES
OF CHURCH OF GOD et al., Appellants,

v.

FAIRBORN CHURCH OF GOD et al., Appellees.

[Cite as *Southern Ohio State Exec. Offices of Church of God
v. Fairborn Church of God* (1989), 61 Ohio App.3d 526.]

Court of Appeals of Ohio,
Greene County.

No. 88 CA 71.

Decided March 29, 1989.

528

*Jerome G. Menz*, for appellants.

*Thomas P. Whelley II, Melanie R. Mackin* and *Phillip L. Beard*, for appellees.

GRADY, Judge.

Appeal is taken by plaintiff-appellant, Southern Ohio State Executive Offices of Church of God, from the judgment and decision of the Court of Common Pleas of Greene County.

A complaint for declaratory judgment was filed below by plaintiff-appellant asking the court of common pleas to determine certain issues arising from its relation to defendant-appellee, Fairborn Church of God. A counterclaim for declaratory judgment on the same issues was then filed by defendant-appellee.

The matter in issue between these parties concerns real property titled in the name of the Fairborn Church of God. Appellant ("Executive Offices") asked the court to declare that the Fairborn Church of God ("Fairborn Church") was and is required to obtain the prior permission of the Executive Offices before conveying any interest in that real property, and to find that Fairborn Church held title to the real property in trust for the Executive Offices. Appellee, Fairborn Church, asked the court to declare that it holds title in fee simple, without any trust or right of reversion benefiting the Executive Offices, and that no permission from the Executive Offices is required of the Fairborn Church to convey its rights in the real property.

After consideration of motions for summary judgment, supported by extensive legal memoranda, exhibits and depositions, filed by both parties, the common pleas court found in favor of the Fairborn Church. The court determined that the Executive Offices, and the Church of God in general, have no interests, legal or equitable, in real estate owned by the Fairborn Church, and ordered that the Fairborn Church is entitled to transfer, sell or otherwise convey its real estate without obtaining the consent of the Executive Offices.

### First Assignment of Error

"The court below erred to the prejudice of plaintiffs-appellants upon its incorrect application of the neutral principles of law doctrine."

The "neutral principles of law doctrine" cited by Executive Offices is a decisional method mandated by the United States Supreme Court for use in resolution of intrachurch property disputes. Its purpose is to avoid incursions by the civil courts into matters of religious dogma, doctrine or practice, the freedom of which from government interference is guaranteed by the First Amendment.

The essence of the case advanced by Executive Offices is that the history of its relationship with Fairborn Church requires the law to find that Fairborn Church holds title to the real property in trust, express, implied or constructive, for the benefit of the Executive Offices.

The facts presented to the court below show that the Fairborn Church of God is a local congregation of the Church of God, of Cleveland, Tennessee. That organization operates through a constituted General Assembly, which acts as a judicatory body in matters of ecclesiastical doctrine and government, and a General Executive Committee. The chief officer of both is a General Overseer. His counterpart on the state level is the State Overseer, and on the district level is the District Overseer. The State Overseer is also appointed by the General Executive Committee.

The State Overseer conducts general evangelistic duties and has authority to appoint district overseers and pastors of local churches. The State Overseer also has authority to authorize the organization of local churches and, together with the district overseer, has authority to approve the selection, purchase and construction of all real property of the church.

Executive Offices is an Ohio not-for-profit corporation, acting by and on behalf of the Church of God, of Cleveland, Tennessee, its General Assembly and Executive Committee. The chief executive officer of Executive Offices is a District Overseer. During most of the times concerned herein that person was Harold B. Thompson.

The Fairborn Church of God is organized as a not-for-profit corporation in Ohio, and has been so organized since 1963. Its pastor and corporate chief executive officer is Reverend Ancil Carter, who began his association with the denomination in 1948 as a minister. Rev. Carter has served as pastor of Fairborn Church for many years, both before and since incorporation. Additionally, Rev. Carter served as District Overseer of the Southern Ohio Executive Offices from 1970 to 1987.

The current Fairborn Church is a successor to several unincorporated associations: the Church of God, Fairborn; the Church of God at Wright View Heights; and, the Church of God at Fairfield. Each of those operated as local congregations of the Church of God, of Cleveland, Tennessee.

After its consolidation, Fairborn Church gave consideration to the need for mortgage loans to support its real property needs. It was learned that in Ohio it is difficult for unincorporated associations to obtain such loans from lending institutions, or was in 1963 when the problem arose. Reverend Carter, who was then as now pastor of Fairborn Church, discussed this matter on several occasions with the State Overseer, Reverend F.W. Goff, who gave permission to Carter and the congregation to incorporate. Articles of Incorporation for Fairborn Church were thereafter filed on July 8, 1963. It is clear that the motivation for incorporation was to facilitate mortgage loans and other real property transactions. Shortly after its incorporation Fairborn Church sought and obtained its first such loan.

According to its Articles of Incorporation, the corporate purposes of Fairborn Church are:

"To form and become the Fairborn Church of God under and in accordance with the General Assembly of the Church of God and to do all things not prohibited by law, and which are in accordance with the teachings of the General Assembly of the Church of God."

It is and for many years has been the position of the General Assembly of the Church of God that real property held by a local church is held in trust for the use and benefit of the Church of God, of Cleveland, Tennessee. A rule was adopted by the General Assembly that any conveyance of real estate to a local church was to be made by a deed form prescribed by the General Assembly and containing the following language: "The said Local Board of Trustees shall hold title to, manage and control the said real estate for the general use and benefit of the Church of God, having its general headquarters in Cleveland, Tennessee, and for the particular use and benefit of the local congregation of the said Church * * *." The deed form goes on to require that conveyances must be approved by a local church conference presided over by the State Overseer. Further provisions require conveyances to the State

Board of Trustees should the local church cease to exist. The General Assembly required that the deed form be used by local churches, and that if it could not be used in its form that similar language benefiting the state and national churches be employed in deeds.

The foregoing requirements, which pre-date the 1963 incorporation of the local church, were known to Rev. Carter, pastor of Fairborn Church. Between 1960 and 1986 Rev. Carter regularly attended the biannual meetings of the General Assembly and other business meetings at which such requirements were discussed. However, and contrary to those requirements, from the date of its incorporation in 1963 Fairborn Church failed to either use the prescribed Church of God warranty deed form or its terms benefiting the Church of God in the course of its real property transactions. Instead, standard warranty deed forms were employed, and those documents on their face settled fee simple title clearly and exclusively on the corporate entity of Fairborn Church.

Prior to its incorporation, Fairborn Church conformed to the deed requirements of the General Assembly. In 1951, the Church of God, one of the predecessor unincorporated associations that later formed Fairborn Church, received land from Mary L. Hall, a widow, on a Church of God warranty deed form containing the beneficial provisions discussed above. After its incorporation, however, no real estate transaction by Fairborn Church employed the deed form or its special language. None of those subsequent transactions was approved by the State Overseer or the district overseer and permission of those officers was not sought by Fairborn Church. At least four such acquisition transactions took place between 1963 and 1986.

In 1986, Fairborn Church undertook purchase of one hundred fifty-six acres of land financed by mortgage. Of that land, a part was to be conveyed to a private developer in a transaction that would produce a substantial profit for Fairborn Church. In a related transaction, Fairborn Church offered to sell some of its property to a church of another denomination, which alerted the State Overseer to the lack of beneficial passages in the titles in the name of Fairborn Church. Thereafter, the Executive Offices acted to protect its interests by making and filing with the county recorder an affidavit asserting its interests in lands owned by Fairborn Church. This action cast a cloud on the titles. The declaratory judgment action below, as brought by both sides, asked resolution of that issue.

It is clear that there are no material issues of fact before us. Fairborn Church and its pastor, Rev. Carter, were fully aware of the requirements of the General Assembly of the Church of God that the local church employ deed forms or language benefiting the national church. Fairborn Church did not

act in accordance with those requirements. Neither did Fairborn Church comply with the requirement that the prior permission of the State Overseer or his agent, the district overseer, be obtained before any transactions in real property were made.

These acts of Fairborn Church commenced with its incorporation in 1963. Until the current dispute arose, Fairborn Church remained in all other respects a faithful local congregation of the Church of God, of Cleveland, Tennessee. Until 1987, when this dispute arose, tithes were remitted by Fairborn Church to the General Assembly on a regular basis and in a substantial amount. Those remissions ceased in 1987. Also in that period, the General Assembly or its agents authorized formation of another congregation of the Church of God in a nearby area.

All monies raised to acquire the real property in issue came from Fairborn Church. Neither the General Assembly nor any of its agencies made any material financial contribution to those purposes.

The claims of Executive Offices are founded on the nature and course of the relationships described above. Executive Offices asked the lower court to determine and order that by reason thereof there exists an "implied trust" in favor of the General Assembly, that is impressed upon the legal title otherwise held by Fairborn Church.

The doctrine of "implied trust" as applied to intrachurch property disputes began to evolve in England in the early nineteenth century as legal toleration of religious dissent grew. *Craigdallie v. Aikman* (H.L.1813), 3 Eng.Rep. 601, was the first reported English case dealing with an intrachurch controversy over property. The dispute arose between a majority and minority faction of the Session Church over a chapel. It was Lord Eldon's view that a court must look to the original principles of a society and award property to the group which adhered to these principles whether it constituted a majority or minority of the congregation and whether it adhered to the governing authority of the church, unless there was evidence of a contract among the members of the congregation that the property was subject to the control of the general church.

In *Attorney–General, ex rel. Mander, v. Pearson* (Ch. 817), 36 Eng.Rep. 135, the dispute was among trustees over whether Unitarians or Protestant dissenters could use a meetinghouse. The court found that church property was held in trust for the propagation of particular religious doctrines, and it was the duty of the court to decide for itself the nature of the original institution and the standard of faith it represented and to award the property to the faction adhering to that standard. The court adopted the theory that local church members had bound themselves by an implied contract to adhere

to the original doctrines. The idea of an implied contract became known as an implied trust.

*Pearson, supra,* became the law of England governing intrachurch disputes as resolved in civil courts. Those courts did not exhibit a reluctance to determine and weigh issues of religious doctrine, dogma or practice in arriving at their decisions. England maintained an established church, and the courts presumed their competence and authority to deal with such issues.

The implied trust theory was transplanted to the United States, also in the early nineteenth century. Though American courts were bound by very different considerations because of the First Amendment *prohibition* of an established religion, the American courts came to results similar to those of the English courts of the same era.

The "implied trust doctrine" evolved in the mid-Atlantic, southern and midwestern states. Where a divided congregation held property under an express trust deed stipulating that the congregation be connected with or subordinate to a general church organization, the courts enforced the trust in favor of the party adhering to that organization. See *McBride v. Porter* (1864), 17 Iowa 203; *Gibson v. Armstrong* (1847), 46 Ky. (7 B.Mon.) 481.

Some courts declared that church property, no matter how obtained, was impressed with a trust for the maintenance of the forms of ecclesiastical government to which the founders had adhered. See *First Constitutional Presbyterian Church v. Congregational Society* (1867), 23 Iowa 567; *Sulter v. Trustees of the First Reformed Dutch Church* (1862), 42 Pa. 503.

Although the rule resembled the English "implied trust doctrine," American courts emphasized continuity of denominational affiliation rather than continuity of religious tenets and generally refused to review the decisions of hierarchial church judicatories on matters of doctrine. See *Gibson v. Armstrong, supra; First Constitutional Presbyterian, supra.*

In *Keyser v. Stansifer* (1834), 6 Ohio 364, the Ohio Supreme Court rejected the implied trust approach. The decision of the majority of the congregation would govern disposition of church property. The court held that unless the deed to church property contained an unequivocal dedication in support of a particular doctrine or form of church government, the local congregations would be deemed owner in fee simple. See, also, *Trustees of the Organ Meetinghouse v. Sealord* (1830), 16 N.C. (I Devereux's Eq.) 453.

The authority of the civil courts to inquire into such issues for the purpose of resolving intrachurch property disputes was confirmed by the Supreme Court of the United States in *Watson v. Jones* (1871), 80 U.S. (13 Wall.) 679, 20 L.Ed. 666. In supporting the right of a state to follow the "implied trust"

theory, the court distinguished cases in which there exists a clear, expressed trust, cases in which there can exist no form of shared ownership interest because the local congregation is strictly independent of any other ecclesiastical governmental associations, and cases in which an implied trust might be found. The court described the latter as those " * * * where the religions congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." 80 U.S. (13 Wall.) 679, 722–723 [20 L.Ed. 666].

Actual resolution of implied trust questions has required that courts inquire into the "polity," or internal structure, of church relationships.

"At least three kinds of internal structure, or 'polity' may be discerned; congregational, presbyterial, and episcopal. In the congregational form, each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers in an ascending succession of judicatories—presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the episcopal form power reposes in the clerical superiors such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical as opposed to congregational polities in which the autonomy of the local congregation is the central principle." Note, Judicial Intervention in Disputes Over the Use of Church Property (1962), 75 Harv.L.Rev. 1142, 1143–1144.

■ Only the hierarchical polity will support the implied trust relationship. The courts must, therefore, delve into the nature and form of the relationship between the church bodies in dispute to resolve the dispute.

The focus and scope of any inquiry into church polities is governed by the decision of the United States Supreme Court in *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church* (1969), 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658. The Supreme Court found that the First Amendment prohibits any inquiry by the courts into religious doctrine or practice. The court stated that the courts have *"no role* in determining ecclesiastical questions in the process of resolving property disputes." *Id.* at 447, 89 S.Ct. at 605, 21 L.Ed.2d at 664. But, the court gave some guidance to the lower courts in making proper inquiries:

"Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to

disputes involving church property. And there are *neutral principles of law,* developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." (Emphasis added.) *Id.* at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665.

"[T]he Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." *Id.* at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665.

The United States Supreme Court did not clearly define what it considered "neutral principles of law," but the state courts have given meaning to the term. In *Maryland and Virginia Eldership v. Church of God* (1969), 254 Md. 162, 254 A.2d 162, the Court of Appeals of Maryland found that the concept included state statutory law, the explicit language of deeds, the charter of the local church and the provisions of the constitution of the general church concerning ownership and control of church property. The Supreme Court approved of that approach in a later decision dismissing appeal, finding that it "involved no inquiry into religious doctrine." *Maryland and Virginia Eldership v. Church of God* (1970), 396 U.S. 367, 368, 90 S.Ct. 499, 500, 24 L.Ed.2d 582, 583.

The Supreme Court of Ohio addressed the issue of neutral principles of law in *Serbian Orthodox Church v. Kelemen* (1970), 21 Ohio St.2d 154, 50 O.O.2d 367, 256 N.E.2d 212, a case that was remanded by the United States Supreme Court for further consideration in the light of the decision in the *Blue Hull* case.

The issue in the *Kelemen* case arose from a dispute between two competing factions for control and use of a local church. The court of appeals had made an inquiry into organizational relationships in resolving the dispute. The Supreme Court found that those inquiries were "unnecessary and immaterial to a *neutral* law inquiry utilizing principles of law developed for use in *all* property disputes." *Id.* at 159, 50 O.O.2d at 370, 256 N.E.2d at 216. The court admonished against attempts to determine matters of church government.

Addressing itself to the "neutral principles of law" standard, the court announced in *Kelemen* that those principles as applicable in the dispute before it were "the ordinary indicia of property rights." *Id.* at 160, 50 O.O.2d at 370, 256 N.E.2d at 216. The court found that it could and should look to the articles of incorporation of the local church, the deeds involved, and the general law of Ohio. On that latter point, the court stated: "A review of Ohio law does not reveal recognition of an implied trust theory of real property

when a local church joins a church hierarchy." *Id.* at 160, 50 O.O.2d at 371, 256 N.E.2d at 217. Though the court offered no references of authority, that decision is in accord with the 1834 decision of the court in *Keyser v. Stansifer, supra.*

Executive Offices' assignment of error here considered argues that the trial court misapplied the "neutral principles of law doctrine" in two ways: First, that the trial court erroneously excluded certain documents relating to the General Assembly and, second, that the trial court reached the wrong conclusion in finding that Executive Offices had no form of ownership interest in the subject property cognizable by Ohio law. We shall consider the issues in that order.

The decision of the trial court shows that it limited its inquiry according to the "neutral principles of law" standard to the terms of warranty deeds, the articles of incorporation of Fairborn Church and the statutory and common law of Ohio. The trial court declined to examine other documents proffered by Executive Offices: the minutes of the General Assembly and the Church of God polity. Executive Offices argues that those documents are not only relevant to the issue of property ownership but also proper for inquiry under the "neutral principles of law" standard.

Executive Offices attributes the argued error of the trial court to its finding that Fairborn Church does not bear a *hierarchical* relationship to the Executive Offices and through it to the General Assembly of the Church of God. Though the trial court did not make an express determination of the issue, it is clear that the course of the decisions beginning with *Watson v. Jones, supra,* supports that inquiry.

■ The reluctance of the trial court to address the issue of church polity, *i.e.*, whether the relationship is hierarchical, is understandable in the light of the admonitions of the court in the *Kelemen* case. Similar inquiries by the lower court of appeals were characterized as "unnecessary and immaterial to a *neutral* law inquiry utilizing principles of law developed for use in *all* property disputes." *Id.* at 159, 50 O.O.2d at 370, 256 N.E.2d at 216. We believe *Kelemen* to be distinguishable from the instant case, however. *Kelemen* involved a general dispute as to church governance that was intertwined with doctrinal disputes. *Kelemen* involved accusations of schism, an issue concerning which the court of appeals had made inquiry. These questions compelled resolution, or at least consideration, of an underlying controversy of an ecclesiastical nature. The case before us does not. There is no general dispute about church governance, certainly not one arising from a dispute over doctrine, dogma or religious practice. The sole issue concerns the ownership of real property. In this case the courts cannot avoid their

responsibility to resolve a dispute civil in character because the litigants are religious bodies. "Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property." *Presbyterian Church v. Hull Church, supra,* 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665.

■ The fundamental definition of an hierarchical church relationship was stated in *Watson v. Jones, supra,* and quoted earlier. Those factors and tests are met here. The General Assembly has the right to establish law to govern its constituent members, including local churches. Operating through its State Overseer, the General Assembly appoints District Overseers and pastors. The General Assembly thus authorizes the creation of local churches, and did so in this case. Indeed, Fairborn Church admits that it is bound by the decisions of the General Assembly in matters of doctrine, teaching and polity, though it denies the same "with reference to legal or property matters." Fairborn Church is, therefore, in a hierarchical relationship to and with the Church of God.

■ Having found a hierarchical relationship, does that authorize a civil court to look beyond deeds and articles of incorporation to church constitutions and similar documents? We believe that it does. The rule in the *Kelemen* case restricts an Ohio court employing neutral principles of law in a property dispute case to those documents that reflect the "ordinary indicia of property rights." *Id.,* 21 Ohio St.2d at 160, 50 O.O.2d at 371, 256 N.E.2d at 216. Those indicia may be present in constitutional documents of the general denominational church. Though Ohio law does not support the theory of implied trust, underlying documents may show the existence of an express or constructive trust, or similar interest, which are recognized in Ohio.

The minutes of the General Assembly and the Church of God polity documents proffered by Executive Offices contain some passages that are secular and others that are ecclesiastical. Certainly, the enjoinder in the minutes that "the Church of God stands now as it has always stood, for the whole Bible, rightly divided," is a passage of exclusively ecclesiastical character. However, other sections are purely secular in their terms. That part of the supplement to the minutes cited by Executive Offices as a basis for its claim states:

"4. A local Board of Trustees shall hold title to manage and control pursuant to the direction of the local congregation all real estate owned by the local congregation by which they are selected provided that all such property shall be used, managed and controlled for the sole and exclusive use and benefit of the Church of God, Cleveland, Tennessee, U.S.A."

■ The guiding principle in review of church documents in civil controversies is that the civil courts may not seek to resolve disputes of an ecclesiastical nature or to make ecclesiastical determinations. A " * * * State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Maryland and Virginia, supra,* 396 U.S. at 368, 90 S.Ct. at 500, 24 L.Ed.2d at 584.

■■ In *Hull Church* the Supreme Court instructed religious bodies to "structure relationships involving church property so as not to require civil courts to resolve ecclesiastical questions." *Id.,* 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665. Civil courts are thus limited to purely secular issues. However, the court is not required to exclude a document or other written source from consideration because it contains passages of an ecclesiastical nature. The United States Supreme Court in *Jones v. Wolf* (1979), 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775, found that the courts might review such documents in resolving church property disputes according to neutral principles of law. The court cautioned, however:

"In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Id.* at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785.

■ We find that the minutes and polity documents relied upon by Executive Offices need not be wholly excluded from consideration by reason of the neutral principles of law rule. While they contain ecclesiastical pronouncements, they also contain ₊passages of a secular nature that bear on the property dispute. Those passages may be scrutinized in purely secular terms. Unless they were excludable on more conventional bases established in the Rules of Evidence, the trial court should have given them consideration in making its determination.

The second component of Executive Offices' assignment of error is that the trial court erred in failing to find some form of beneficial interest in Executive Offices in the title ownership of the real property. In addressing this question, we shall consider those passages in the minutes and polity documents which may be analyzed on a secular basis, along with articles of incorporation, deeds, and the general law of Ohio.

■ Executive Offices argues that an "implied trust" arises from the relationship between Fairborn Church and the Church of God. In each of the major decisions supporting that theory, *Watson, Hull Church, Maryland and Virginia, Wolf,* the underlying law of the jurisdiction concerned supported the

application of the implied trust doctrine in church property disputes. Ohio does not, however. In both the *Kelemen* case and the earlier case of *Keyser v. Stansifer, supra,* the Supreme Court of Ohio rejected the doctrine. We cannot, therefore, attempt its application here.

The neutral principles of law doctrine is not restricted to applications of the implied trust theory. "The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." *Jones v. Wolf* (1979), 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775. A review of those concepts is appropriate.

The trial court found that the documents reviewed by it did not support a finding that Executive Offices held some title interest in the real property, whether by the terms of the deeds or the terms of an express trust. Additional consideration of the minutes and polity documents compel the same conclusions. They do not contain the explicit provisions necessary to create an interest of either kind in the Executive Offices or the Church of God.

The deeds contain no language settling an interest on the general church. Indeed, that omission is the source of this litigation. We note, however, that the 1951 conveyance by Mary Hall to one of the predecessor unincorporated associations contained language benefiting the general church. We have not been informed of the extent to which the current holdings of Fairborn Church are affected by that conveyance, and no question of undue enrichment arising from that transaction has been raised.

We cannot find that the terms of the minutes, their supplements, or the polity documents, create an "express trust" favoring the general church. The terms of the supplement to the minutes quoted above provide that the local church and congregation shall hold title to and manage and control the property. Those terms further provide that such ownership shall be discharged for the "sole and exclusive use and benefit of the Church of God, Cleveland, Tennessee." At most, these provisions, and others concerning use of deeds, create a form of "equitable charge" on the ownership interest of the local church. The local church is not a fiduciary of the general church. The local church holds most, if not all, of the ownership interest. These factors distinguish the relationship from a trust. See Bogert, Trusts (6 Ed.1987), Section 14. A beneficiary of an equitable charge may bring an action for breach. But no breach or damages arising therefrom has been alleged. Indeed, the element of failure to use deeds appears to be the only division between the parties.

Ohio has recognized the doctrine of "constructive trust," and has applied it to real property transactions.

"A constructive trust is a fiction of equity, devised to the end that the equitable remedies available against a conventional fiduciary may be available under the same name and processes against one who through fraud or mistake or any means ex maleficio acquires property of another. *Pearl–Market Bank & Trust Co. v. Edward D. Woodward Co.*, 22 Abs. 328 (App.1935).

"Whenever one person is placed in a relation to another, by the act or consent of that other, or the act of a third person, or of the law, so that he becomes interested for him or with him, in any subject of property or business, he will in equity be prohibited from acquiring rights in that subject which are antagonistic to the person with whose interest he has been associated. *Shaw v. Perry*, 95 NE2d 585, 58 Abs 112 (App.1949)." 3 McDermott, Ohio Real Property Law and Practice (1966) 352, Section 27–14A. Constructive trusts have been imposed when it is found that one party is enriched at the expense of another with whom he maintains a "confidential or fiduciary relationship." McDermott, *supra*, at 353. Indeed, constructive trusts have been found in cases in which no fraud is involved.

The Court of Appeals for Washington County made the following observations in its syllabus in *Croston v. Croston* (1969), 18 Ohio App.2d 159, 47 O.O.2d 260, 247 N.E.2d 765:

"1. A 'constructive trust' is created by operation of law and arises where the holder of the legal estate and property cannot also enjoy the beneficial interest therein without violating some established principle of equity.

"2. In order for a constructive trust to be imposed, the conduct of the parties must be such as to give rise to the exercise of equitable jurisdiction."

There are strong reasons to find that Fairborn Church, in its corporate body, holds title to the real property in question in constructive trust for Executive Offices and the Church of God. Rev. Ancil Carter, chief corporate executive officer, has been an ordained minister in the Church of God denomination for forty years. He must be presumed to have enjoyed the special trust and confidence of that body. During much of the period since incorporation of Fairborn Church, Rev. Carter was a District Overseer whose functions were to protect the interest of Executive Offices and their parent organizations. He failed to do so, even though he was fully aware of the policies adopted by the General Assembly concerning property ownership matters. Rev. Carter seems to have regarded the incorporation of his church as authority to deviate from those policies and an opportunity to do so to the greater profit of his own congregation. Executive Offices never regarded its permission to incorporate as conveying those benefits to Fairborn Church.

We are, nevertheless, unable to impose a constructive trust for the benefit of Executive Offices. The monies for the purchase of the real property came only from the congregation of Fairborn Church. No contribution came from Executive Offices or its parent bodies. There is not, therefore, an unjust enrichment adequate to give rise to equitable jurisdiction.

Executive Offices further argues that the "living relationship" test adopted in certain cases should be followed here to make findings that Fairborn Church is bound by the decisions of Executive Offices and, ultimately, the Church of God. The "living relationship" test has been followed by certain courts including the Supreme Court of Ohio (*Morrow v. Hill* [1977], 51 Ohio St.2d 74, 5 O.O.3d 45, 364 N.E.2d 1156), the United States District Court for the Eastern District of Michigan (*Kendysh v. Holy Spirit B.O.A.C.* [1987], 683 F.Supp. 1501), and the United States Sixth Circuit Court of Appeals (*Kendysh v. Holy Spirit* [1988], 850 F.2d 692).

We believe that the living relationship test is not appropriate to the issues before us in this case. The living relationship test looks *beyond* the ordinary indicia of property ownership expressed in deeds, articles of incorporation, and like documents, and examines the rituals and practices of the churches in dispute to determine the governmental relationship or polity prevailing.

The cases employing the living relationship test have done so as a part of the determination of the prevailing church polity—congregational or hierarchical. In those cases deeds, articles of incorporation, church constitutions, and other similar documents have been inconclusive in determining that issue. In addition, the cases arise from a setting in which a schism has produced competing factions each of which demands recognition as the authentic representative of the original body with the consequent right to control the pulpit and the real estate. The courts have examined ritual and practice to settle such disputes, but only in a secular sense and only to determine whether an expressed choice of the parent body governs disposition of the property.

The issues concerned in the living relationship cases are not before us here. There is no schism: the General Assembly has not sought to oust Rev. Carter or declare his congregation in schism, and Fairborn Church has not acted to separate itself from the doctrinal or secular control of the parent body, except as to ownership of real property. The polity of the church is clear—it is a hierarchical relationship. No further reference need be made to ritual or practice to determine that. Indeed, reference to ritual and practice sheds no additional light on the central issue; who owns the real property. That issue is settled in the deeds, articles of incorporation, the minutes, polity documents, and other documents.

### Second Assignment of Error

"The court below, upon its refusal to impress the real estate owned by the Fairborn Church of God with a trust for the use and benefit of Church of God through its state overseer, violated the First Amendment and Fourteenth Amendment to the Constitution of the United States."

Executive Offices argues that the courts are obligated to follow and enforce the decisions in matters of church government of the General Assembly as that body has acted as a judicatory body making decisions of an ecclesiastical nature. To do otherwise, they assert, contravenes the First Amendment and establishes a religion.

Executive Offices relies on *Serbian Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151. In that case the parent church defrocked a bishop. The Illinois courts reversed that decision, finding that the ecclesiastical body had failed to follow its own adopted procedures. The United States Supreme Court reversed, holding that the Illinois court's action was an improper judicial interference with the decisions of a hierarchical church, and in thus interposing its judgment into matters of ecclesiastical cognizance and polity the court contravened the First and Fourteenth Amendments. The court said:

"For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense 'arbitrary' must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else in to the substantive criteria by which they are supposedly to decide the ecclesiastical question." *Id.* at 713, 96 S.Ct. at 2382, 49 L.Ed.2d at 165.

The position taken by Executive Offices would require the courts to enforce the announced decisions of the church judicatory in all ecclesiastical matters. That would, inevitably, entail inquiries by the court into the regularity of those actions, the same kind of inquiry prohibited in *Milivojevich, supra*.

" 'But it is easy to see that *if the civil courts are to inquire into all these matters, the subject of the doctrine theology, and usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws * * * and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.'*

\* \* \* (Emphasis supplied.)" *Id.* at 714, 96 S.Ct. at 2383, 49 L.Ed.2d at 165, quoting *Watson v. Jones*, 13 Wall., at 733–734, 20 L.Ed. at 678.

The First Amendment enjoins and prohibits state action in matters of religion, *i.e.*, in matters consisting of or touching on ecclesiastical issues of religious doctrine or practice, and it also prohibits " \* \* \* state interference (in) matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral* (1952), 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120.

Were this court to delve into or mandate the enforcement of the decisions of the church judicatory, the General Assembly, it would contravene the clear prohibitions of the First Amendment against "interference" in religious matters. We must not forget that the directions of the First Amendment are prohibitions of action. To undertake enforcement of church actions would violate the fundamental purpose of the amendment.

Neither this court nor the court below has *de facto* established a religion in our decisions. We have followed the direction of the United States Supreme Court in the *Blue Hull* case to make our decision according to "neutral principles of law \* \* \* which can be applied without 'establishing' churches to which property is awarded." *Id.*, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665.

For the reasons stated, this court finds that the trial court did not err in sustaining the motion for summary judgment of Fairborn. The judgment of the court of common pleas will be affirmed.

*Judgment affirmed.*

WOLFF, P.J., and WILSON, J., concur.